**EXHIBIT A**

Deposition of Kirk Houtchens - Taken July 26, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

W.A. DREW EDMONDSON, in his )
capacity as ATTORNEY GENERAL )
OF THE STATE OF OKLAHOMA and )
OKLAHOMA SECRETARY OF THE )
ENVIRONMENT C. MILES TOLBERT, )
in his capacity as the )
TRUSTEE FOR NATURAL RESOURCES )
FOR THE STATE OF OKLAHOMA )
                                   )
        Plaintiffs, )
                                   )
vs. )         4:05-CV-00329-TCK-SAJ
                                   )
TYSON FOODS, INC., et al., )
                                   )
        Defendants. )
                                   )

VIDEOTAPED DEPOSITION OF KIRK HOUTCHENS
      Taken at the law offices of Mitchell, Williams,
Selig, Gates & Wooyard, 5414 Pinnacle Point Drive, Suite
500, Rogers, Arkansas 72758, on July 26, 2007, at 11:36
a.m.

DONALD COURT REPORTING, INC
888-438-7836 www.getsteno.com


EXHIBIT 2

Deposition of Kirk Houtchens - Taken July 26, 2007

### Page 2

APPEARANCES

MR. M. DAVID RIGGS        FOR THE PLAINTIFF
MR. RICHARD T. GARREN
Riggs, Abney, Neal, Turpen
  Orbison & Lewis, P.C.
Frisco Building
502 West Sixth Street
Tulsa, Oklahoma 74119-1010
(918) 587-3161
(918) 583-1549 Fax

MR. A. SCOTT McDANIEL     FOR THE DEFENDANT
320 S. Boston Avenue, Suite 700   PETERSON FARMS
Tulsa, Oklahoma 74103
(918) 382-9200
(918) 382-9282 Fax

MR. MICHAEL R. BOND       FOR THE DEFENDANT
MR. ROBERT W. GEORGE      TYSON FOODS, INC.
Kutak Rock, LLP
214 West Dickson Street
Fayetteville, Arkansas 72701
(479) 973-4200
(479) 973-0007 Fax

MS. VICKI BRONSON         FOR THE DEFENDANT
MR. JOHN R. ELROD         SIMMONS FOODS
Conner & Winters
211 East Dickson Street
Fayetteville, Arkansas 72701
(479) 582-5711
(479) 587-1426 Fax

MR. PAUL E. THOMPSON      FOR THE DEFENDANT
Bassett Law Firm          GEORGES, INC.
P.O. Drawer 3618
Fayetteville, Arkansas 72702-3618
(479) 521-9996
(479) 521-9600 Fax

### Page 3

APPEARANCES (Cont.)

MS. THERESA NOBLE HILL    FOR THE DEFENDANT
MR. JOHN TUCKER (By Telephone)   CARGILL TURKEY
Rhodes, Hieronymus, Jones,       PRODUCTION
Tucker & Gble, PLLC              CARGILL, INC.
P.O. Box 21100
Tulsa, Oklahoma 74121-1100
(918) 582-1173
(918) 592-3390 Fax

MR. ROBERT E. SANDERS     FOR THE DEFENDANT
Young Williams, P.A.      CAL-MAIN FOODS, INC.
P.O. Box 23059            CAL-MAIN FARMS, INC.
Jackson, Mississippi 39201
(601) 948-6100
(601) 355-6136 Fax

MS. SHERRY P. BARTLEY     FOR THE DEFENDANT
Mitchell, Williams, Selig,   PETERSON FARMS, INC.
  Gates & Woodyard, PLLC
425 W. Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201-3525
(501) 688-8800
(501) 688-8807 Fax

MS. JENNIFER GRIFFIN (By Telephone)  FOR THE DEFENDANT
Lathrop & Gage                       WILLOW BROOK FOODS
314 E. High Street                   INC.
Jefferson City, Missouri 65101
(573) 761-5006
(573) 893-5398 Fax

Also Present: Ms. Janet Wilkerson
              Mr. Blake Trolinger, Videographer

### Page 4

INDEX
TESTIMONY BY KIRK HOUTCHENS                Page
Examination by Mr. Riggs ----------------- 5

EXHIBITS

Plaintiff's
Exhibit                    Marked

1A  (7/26/07 Memorandum from Scott McDaniel) --- 39
1B  (List of Peterson Farms Active Grower
     Watersheds) ------------------------------- 36
3   (3/7/07 Email from Jamie Burr) ------------- 9
3A  (Poultry Litter Production for The Illinois
     River Watershed in Oklahoma) -------------- 21
4   (Individual Grower History) ---------------- 14
5   (Oklahoma Statutes Annotated Currentness
     Title 82, Section 1451) ------------------- 26
6   (The Oklahoma State Courts Network Document)- 49
7   (Poultry Water Quality Handbook) ----------- 51
8   (Letter to Citizens of Oklahoma) ----------- 79
9   (3/27/1998 Interoffice Memorandum from
     Ron Mullikin) ----------------------------- 93
10  (7/24/98 Memorandum from Ron Mullikin) ----- 97
11  (11/24/98 Memo from Ronald Mullikin) ------- 104
12  (Agricultural Land Use, Nutrients, and Water
     Quality in Benton and Washington Counties) - 108
14  (4/18-19/88 National Poultry Waste Management
     Symposium) -------------------------------- 115
15  (4/12/04 Memorandum from D.J. Parrish) ----- 118
16  (1993 Research Conference on Focus on
     Phosphorus) ------------------------------- 125
18  (6/17/05 Introduction & Acknowledgment) ---- 131
24  (12/14/98 Letter from Dan Henderson) ------- 139
25  (10/1/04 Letter from Blake Evans) ---------- 139
26  (U of A Cooperative Extension Service Soil
     Analysis Report) -------------------------- 143
27  (List of Ingredients in Peterson Farms Feed)- 151
28  (7/18/07 Letter from A. Scott McDaniel) ---- 167

### Page 5

1   THE VIDEOGRAPHER: The time is 11:36. This
2   is the beginning of tape 1 of the deposition of Kirk
3   Houtchens. We're on the record.
4       KIRK HOUTCHENS, having been called upon to
5   testify in the form of a deposition and having been duly
6   sworn, testified as follows, to wit:
7                        EXAMINATION
8   BY MR. RIGGS:
9   Q.  Would you state your full name for the record,
10  please?
11  A.  Casey Kirk Houtchens.
12  Q.  Mr. Houtchens, for whom are you employed?
13  A.  Peterson Farms.
14  Q.  What is your job with Peterson Farms?
15  A.  I'm the live production manager.
16  Q.  How long have you held that position?
17  A.  Since February of '07.
18  Q.  Were you employed by Peterson Farms prior to that
19  time?
20  A.  Yes.
21  Q.  What was your job just before assuming this current
22  job?
23  A.  I was a broiler service technician and building
24  coordinator.
25  Q.  How long have you worked for Peterson Farms?

Deposition of Kirk Houtchens - Taken July 26, 2007

### Page 38

1  Q. (Mr. Riggs continued.) Well, for what period of
2  time could you provide that information with the data that
3  we've discussed?
4  A. I'm not very sure, but I -- I'm sure you could for
5  the -- you know, for the last year or two. But, there
6  again -- then again, I'd only be speculating.
7  Q. Who would know more about that than you in your
8  company?
9  A. Well, I -- I would assume Ray Wear would possibly
10 know. He's in the office, I'm not. That may be, you
11 know, may be something you could ask Janet Wilkerson this
12 afternoon.
13 Q. Who in the company would be better prepared to give
14 us the information sought by item No. 7?
15     MR. McDANIEL: Object to the form,
16 suggesting that he's not adequately prepared.
17 Q. (Mr. Riggs continued.) Well, what did you do to
18 prepare to answer No. 7?
19 A. Well, like I stated earlier, I was under the
20 impression that all this information was already sent to
21 the plaintiff in the records for each grower file for
22 every broiler grower and breeder grower in the IRW.
23 Q. Are you under the impression or were you also told
24 that we would, therefor, not have a right to talk to you
25 about that?

### Page 39

1  A. Could you say that again, sir?
2  Q. Just because we have documents, does that -- did
3  someone tell you we wouldn't have a right to inquire of
4  you about what's in those documents?
5      MR. McDANIEL: I haven't objected to your
6  inquiry, David.
7  A. No, I did not.
8  Q. (Mr. Riggs continued.) I've marked as 1A a document
9  which was provided us today by your counsel. Do you
10 recognize that?
11     (Wherein, Plaintiff's Exhibit 1A was marked.)
12 A. I've not seen this before, but I -- I can read.
13 That's all I recognize.
14 Q. Give me each and every number on that list there
15 that your name is beside. Would you read into the record
16 the numbers your name is beside?
17 A. Three, 4, 5, 8, 6, 7, 9, 10, 11, 12, 13, 14/15,
18 16/17, 18/19, 20, 21, 22, 23, 25, 31. Oh, and 34.
19 Q. What is your understanding about your duty with
20 respect to each of those numbered items?
21 A. My understanding is that I am the corporate witness
22 for Peterson Farms on the topics in each of these items.
23 Q. Okay. And those topics, do you understand,
24 correspond to the numbered topics in Exhibit No. 1 to your
25 deposition?

### Page 40

1  A. Yes.
2  Q. Can you tell me how much time you spent preparing to
3  testify for the company regarding those topics?
4  A. Approximately eight hours.
5  Q. What did you do during that eight hours?
6  A. I looked over different records, different files.
7  Q. What kind of records?
8  A. Feed formulas, the Exhibit 1B, which I've produced,
9  different analysis, litter analysis, ingredient analysis,
10 that type of nature of things.
11 Q. Okay. Anything else with regard -- which would
12 relate to items No. 6 and 7 on the list of topics?
13 A. None -- none other than 1B.
14 Q. Are there other records kept in the company besides
15 the one you've chosen to bring today, which would have a
16 bearings on the subject matter of No. 6 and 7 on the list?
17     MR. McDANIEL: Object to the form. It's
18 been asked and answered.
19 A. Again, it would be the same files that we even
20 looked today, individual grower records, the grower's
21 files that would, you know, show how many birds were
22 placed, how many flocks he'd raised, how many head he
23 sold, how much they weighed.
24 Q. (Mr. Riggs continued.) Is there nowhere within the
25 company records totals of birds produced or is it all just

### Page 41

1  left to the individual grower file?
2  A. The individual growers have a grower number, and
3  that's how we recognize those files or those -- those
4  contract growers.
5  Q. Are you saying no one in the company looks at total
6  numbers by these individual growers taken together?
7  A. Not that I'm aware of. I haven't personally as a
8  live production manager.
9  Q. The company knows how many birds it processes for
10 the market each year, doesn't it?
11 A. I believe so.
12 Q. Does the company know, then, how many birds it
13 processes for the market each year by watershed?
14 A. I don't believe we do. We have -- for our records
15 and our analysis, we -- we look at just the overall
16 picture.
17 Q. Let's look at Nos. 10 and 11 on the list of topics
18 you were to testify about today. Number 10 says, "The
19 amount of poultry waste generated during the lifetime of
20 an individual bird specified by bird types owned by you
21 within the IRW."
22     I think I've covered that with you, and I think you
23 told me that you don't know. Is that correct?
24 A. Yes, sir.
25 Q. And did anyone within company have any information

Deposition of Kirk Houtchens - Taken July 26, 2007

Page 90

1  Q.  Yes, sir.
2  A.  I don't believe we do, but that's not really -- I'm
3  not involved in that --
4  Q.  All right.
5  A.  -- part of the company.
6  Q.  All right. Has the company ever had an
7  environmental division?
8      MR. ELROD: I'm sorry, what's the last word,
9  David?
10     MR. RIGGS: Environmental division.
11     MR. ELROD: Division. I'm sorry.
12 A.  There again, I'd really rather for that to be Mrs.
13 Wilkerson.
14 Q.  (Mr. Riggs continued.) Okay. All right. Are there
15 employees in Peterson, regardless of whether or not
16 there's a specific division in the company devoted to this
17 area, but are there employees in Peterson Farms, Inc., who
18 have duties regarding environmental matters?
19 A.  I'm -- I believe we do, but that would be better to
20 ask Mrs. Wilkerson. You know, we -- we have our -- our
21 own facilities in Decatur, so I'm -- I'm sure we have
22 environmental people there because we have, you know,
23 regulations to uphold there. If that's what you're
24 asking, if we have environmental people for our -- our
25 company.

Page 91

1  Q.  Well, can you identify environmental concerns that
2  Peterson Farms has?
3      MR. McDANIEL: Object to the form.
4  A.  Peterson Farms, I believe we have to -- I mean, we
5  have runoff issues we worry about with the feed mill or
6  with the hatcheries or, you know, with the processing
7  plant.
8  Q.  (Mr. Riggs continued.) What about in the poultry
9  waste as used, when the Water Quality Handbook uses it,
10 after its been land applied?
11     MR. McDANIEL: Object to the form.
12 Q.  (Mr. Riggs continued.) Do you have an environmental
13 concern about that as a company?
14 A.  We have a concern about it if it's mishandled.
15 Q.  Do you agree that poultry waste, as that term is
16 used in the Water Quality Handbook you recommended to all
17 your growers, produced by chickens owned by Peterson Farms
18 in the Illinois River Watershed does adversely affect the
19 quality of water in that watershed?
20     MR. McDANIEL: Object to the form.
21 A.  I don't believe we feel like it adversely affects
22 the quality of water if it's applied properly.
23 Q.  (Mr. Riggs continued.) Then why would you recommend
24 hauling a lot of it out or creating buffer zones or using
25 alternatives for it in an ad that's designed to protect

Page 92

1  the environment?
2      MR. McDANIEL: Object to the form.
3  A.  Well, there again, I -- I think that Peterson Farms,
4  and I'm not going to speak for anyone else on this, but
5  just from reading this, I believe this is, you know --
6  part of it is publicity, and we do care about anybody's
7  watershed, anybody's scenic rivers, whatever state they're
8  in. We still believe that -- that the litter that the
9  growers own is being applied properly through their
10 nutrient management plans through state people that are a
11 lot better trained at this and, you know, they're --
12 they're educated in this. This is their specialty, this
13 is their career. So I believe that's our stand, and
14 that's -- that's why I answer that way.
15 Q.  (Mr. Riggs continued.) Do you know who Ron Mullikin
16 is?
17 A.  Yes.
18 Q.  Who -- who is Ron Mullikin?
19 A.  I don't know him very well. He used to be an
20 employee with Peterson Farms.
21 Q.  What period of time was it that he worked there?
22 A.  I'm not really sure. He -- I didn't work with him.
23 Probably late '90s.
24 Q.  Was he someone who had environmental
25 responsibilities for Peterson?

Page 93

1  A.  I -- the last I knew -- I just thought he worked in
2  human resources as like a trainer or something.
3  Q.  Let me hand to you an exhibit. It's a two-page
4  document. Number 9, I think it is. Take a minute to look
5      (Wherein, Plaintiff's Exhibit 9 was marked.)
6  A.  I didn't read it all, but I looked at all of it --
7  Q.  Okay.
8  A.  -- if you're ready.
9  Q.  It says it's a memo, interoffice memo, to Dan
10 Henderson. I believe you told he was the president of the
11 company. Right?
12 A.  Yes.
13 Q.  At one time.
14 A.  Yes, sir.
15 Q.  And it's dated March 27th, 1998. Would that have
16 been a time when Mr. Henderson was president?
17 A.  I believe so, yes.
18 Q.  And it has copies to Vic Evans and Janet Wilkerson.
19 Who is Vic Evans?
20 A.  At the time, Vic Evans was our CEO.
21 Q.  He's no longer your CEO?
22 A.  No, sir.
23 Q.  Do you know what Miss Wilkerson's job was at that
24 time?
25 A.  I believe she was vice president of human resources.

24 (Pages 90 to 93)

Deposition of Kirk Houtchens - Taken July 26, 2007

### Page 94

1  Q. Okay. Mr. Mullikin says in this letter to the
2  company president in 1998, "In the past few months I've
3  been exposed to a wealth of information and individuals in
4  the poultry industry. I would like to share with you some
5  of my views on where we are, and where we may be headed on
6  the poultry litter issue.
7      "I personally have no opinion about whether or not
8  the intergrator or the grower owns the litter. I do feel
9  without any doubt that as time passes, we the intergrator
10 will be found to liable for it and the affect it has on
11 our environment."
12     Do you know if, as a result of this written opinion
13 expressed to the president by Mr. Mullikin, whether or not
14 there was within the company around that time a discussion
15 about the contents of that statement?
16 A. No, I don't.
17 Q. Do you remember any discussions within the company
18 about who should take responsibility for the litter, and
19 to use Mr. Mullikin's words, the effect it has on the
20 environment?
21     MR. McDANIEL: Object to the form.
22 A. No, I don't.
23 Q. (Mr. Riggs continued.) Were you personally ever
24 involved in any discussions about who should take
25 responsibility for the poultry litter produced by the

### Page 95

1  company's chickens?
2  A. No, I didn't.
3  Q. Do you know if any of the policies of the company
4  changed with respect to the question of who should take
5  responsibility for the litter produced by its chickens as
6  a result of this memorandum by Mr. Mulligin to president
7  Henderson?
8  A. No, I don't.
9  Q. Let me ask you to look at the last paragraph of the
10 Mullikin memorandum. It says, "Dan," meaning Dan
11 Henderson, "I feel the direction Peter Farm" -- "Peterson
12 Farms and all integrators would best be served to focus
13 its resources towards, would be alternative uses. Things
14 such as using litter as bedding, feed, fertilizer, and
15 fuel are just a few of the uses I've found some
16 information on. Each of these uses has its own set of
17 benefits and short-comings. But they all address the
18 environmental need to stop applying litter to our local
19 pasture lands."
20     Now, that memo was written over nine years ago, and
21 he said in the last words of the memo, I'm quoting,
22 "integrators would be best served to focus their resources
23 towards all" -- "addressing the environmental need to stop
24 applying litter to our local pasture lands."
25     What has Peterson Farms done since that time to

### Page 96

1  address the environmental need to stop applying litter to
2  local pasture lands?
3      MR. McDANIEL: Object to the form.
4  A. Well, I don't know -- personally, I wasn't involved
5  of anything as a result of this memo. I just -- I know of
6  all the things that have been done since '97 to present.
7  Q. (Mr. Riggs continued.) To stop applying litter to
8  local pasture lands to address environmental needs?
9      MR. McDANIEL: Object to the form.
10 A. No, I don't.
11 Q. (Mr. Riggs continued.) You don't know of anything
12 the company's done in response to --
13 A. In response to this memo?
14 Q. -- Mr. Mullikin's statement that the company'd be
15 best served to address the environmental need to stop
16 applying litter to local pasture land?
17     MR. McDANIEL: Object to the form.
18 A. No, not directly related to this memo, I don't. I
19 know of things we've done since --
20 Q. (Mr. Riggs continued.) Okay.
21 A. -- '97, but I can't say it was because of this memo.
22 Q. Okay.
23 A. I just --
24 Q. What -- what things have you done which would
25 address the environmental need to stop applying litter to

### Page 97

1  local pastures?
2      MR. McDANIEL: Object to the form.
3  A. There again, Peterson Farms requires that its
4  growers have nutrient management plans through their --
5  the appropriate state agencies, and I know that is one
6  thing. Now, whether that allows them to apply litter on
7  -- on their land or not would also -- it just depends on
8  their plan, what their nutrient plan is and their soil
9  samples.
10 Q. (Mr. Riggs continued.) But this says not to apply
11 in any particular way but to stop applying it, doesn't it?
12 He says, "There's an environmental need to stop applying
13 litter to local pasture lands," doesn't he?
14 A. Looks like he says that the alternative methods
15 address the environment need to stop applying litter, but
16 this, basically, is leading on -- I don't -- just reading
17 it, I'm not trying to interpret what he was thinking when
18 he wrote it, but that's what it looks like to me.
19 Q. Let me hand you Exhibit 10, another memorandum from
20 Mr. Mullikin.
21     (Wherein, Plaintiff's Exhibit 10 was marked.)
22     This is about three months later, I guess. It's
23 July 24th, 1998. Sent to Dan Henderson, Gene Wilmoth,
24 Sean Holcombe, Rodney Dunnam, and Janet Wilkerson. Let me
25 first ask you who is Gene Wilmoth?

25 (Pages 94 to 97)

Deposition of Kirk Houtchens - Taken July 26, 2007

### Page 98

1  A. Gene Wilmoth was our executive VP of production.
2  Q. Is that the job you now have? Is that --
3  A. I'm just like a production manager.
4  Q. Okay.
5  A. He's retired.
6  Q. Okay. Sean Holcombe. Who is he?
7  A. He was a former breeder/manager.
8  Q. Rodney Dunnam?
9  A. Rodney has had several capacities in the company,
10 and at that time I'm not sure what his position was. It
11 might have been buy -- grain buyer.
12 Q. Okay. Was Dan Henderson still president in July of
13 '98?
14 A. Yes, sir.
15 Q. This memo does deal specifically with the Spavinaw
16 Eucha Watershed. Let me ask you, have you seen it before?
17 A. No, I haven't.
18 Q. Okay. In the middle paragraph Mr. Mullikin says,
19 quote, We need to find and develop new plans for waste
20 management that work for our growers. The meeting was
21 helpful for only two growers, of which one was ours. Out
22 of 37 fields, 31 had too high of a phosphorous level,
23 which was anything above 300 pounds. This meant that
24 those who were in that range couldn't fully develop their
25 plan or put any more litter on their fields. Our growers

### Page 99

1  feel as though they have nowhere left to turn."
2       Do you understand what Mr. Mullikin was referring to
3  in those comments, this 31 out of 37 fields had too much
4  phosphorous?
5       MR. McDANIEL: Object to the form.
6  A. I believe he's saying that 37 out of 31 were above
7  300 pounds.
8  Q. (Mr. Riggs continued.) Okay.
9  A. But I'm not aware at this time, you know -- you
10 know, what his -- what he was con -- you know, referring
11 to as far as the --
12 Q. He does say the phosphorous levels were too high to
13 allow those fields to accommodate any more poultry litter,
14 doesn't he?
15 A. I believe that's what he's writing in this.
16 Q. Says they couldn't fully develop their plan or put
17 any more litter on their fields. Correct? Thirty-one out
18 of 37. Is that your understanding of the memo?
19 A. Yes.
20 Q. Does Peterson Farms have any evidence which would
21 show or even suggest that a survey of fields with the
22 Illinois River Watershed would produce substantially
23 different results?
24      MR. McDANIEL: Object to the form.
25 A. Different results from what?

### Page 100

1  Q. (Mr. Riggs continued.) This was a survey testing 37
2  fields in the Spavinaw Eucha Watershed, and 31 had too
3  much phosphorus to accommodate any more litter. I'm
4  asking if Peterson Farms has any evidence which would show
5  or suggest that a survey of fields in the Illinois River
6  Watershed would produce substantially different results.
7       MR. McDANIEL: Object to the form.
8  A. No, we don't have any evidence of that.
9  Q. (Mr. Riggs continued.) Are the practices regarding
10 how poultry litter is managed and utilized any different
11 for Peterson Farms' growers in the Illinois River
12 Watershed from the practices of its growers in the Eucha
13 Spavinaw Watershed?
14      MR. McDANIEL: Time frame? Can you specify
15 a time frame?
16      MR. RIGGS: Well, it says currently.
17      MR. McDANIEL: Okay.
18 A. Currently?
19 Q. (Mr. Riggs continued.) Yeah.
20 A. Yeah, the practices would be different because of
21 the Tulsa settlement.
22 Q. The use of poultry litter is more restrictive in the
23 Eucha Water -- Spavinaw Watershed than the Illinois
24 Watershed at present. Right?
25      MR. McDANIEL: Object to the form.

### Page 101

1  A. It's probably not in Oklahoma.
2  Q. (Mr. Riggs continued.) Well, how is it different
3  then? You said it was different because of that
4  settlement, so how is it different?
5  A. Well, what's different is we use a nutrient
6  management team from -- the -- a judge-appointed team, the
7  Eucha Spavinaw Watershed. We don't use the NRCS. That's
8  how it's different.
9  Q. And does that result in more or less litter being
10 applied in the Eucha Spavinaw Watershed for the available
11 pasture land than the Illinois River Watershed?
12      MR. McDANIEL: Object to the form.
13 A. I believe that there may be a slight difference in
14 the phosphorus indexes, but it's pretty tough in both
15 Arkansas and Oklahoma, so --
16 Q. Do you know --
17 A. -- you know, everyone is -- whether it's in the
18 Spavinaw Eucha or in the Illinois in Arkansas or the
19 Illinois in Oklahoma, the -- the main difference is, is
20 our growers in the Arkansas -- not in the Arkansas, but
21 anywhere in the Spavinaw Eucha Watershed, they have people
22 come directly from the Spavinaw Eucha nutrient management
23 team.
24 Q. So are you saying there's more oversight of those
25 litter spreading practices in the Eucha Spavinaw Watershed

26 (Pages 98 to 101)

Deposition of Kirk Houtchens - Taken July 26, 2007

### Page 102

1 than in the Illinois Watershed?
2 A. No, I'm not saying there is at all.
3 Q. Is there --
4 A. Just different oversight.
5 Q. Okay. What is the oversight in the Illinois River
6 Watershed of that practice?
7 A. That would be the state -- the -- the Oklahoma
8 Department of Agriculture, the Oklahoma DEQ, the Oklahoma
9 NRCS, the Arkansas DEQ, the Arkansas NRCS. You would have
10 to talk to them.
11 Q. So tell me again. I'm sorry. I'm just not
12 understanding what you're saying the difference is between
13 the two watersheds as a result of the settlement. What
14 things are happening in the Eucha Spavinaw Watershed
15 regarding the application -- land application of poultry
16 litter that are -- are not happening in the Illinois River
17 Watershed?
18     MR. McDANIEL: Object to the form.
19 A. The difference is, is that when a grower wants to
20 spread his litter or he's considering spreading his litter
21 in any of the watersheds, the difference is in our -- in
22 the Spavinaw Eucha, a court-appointed or a group, someone
23 else comes out and samples his soil versus someone from
24 either the Department -- NRCS from Arkansas or Oklahoma.
25 Q. (Mr. Riggs continues.) Well, that does not happen

### Page 103

1 in the Illinois River Watershed, does it? The growing
2 samples his own fields. Correct?
3 A. No, that's not correct.
4 Q. Who does the sampling in the Illinois River
5 Watershed?
6 A. An employee from the NRCS.
7 Q. In every instance that's the case?
8 A. I believe. I'm not -- you know, we don't sample
9 their fields for them, we just expect them to, you know,
10 comply by state and federal laws.
11 Q. Do you know who actually pulls the samples that are
12 sent to the lab to be analyzed?
13 A. I don't.
14 Q. Let's say the Illinois River Watershed currently.
15 A. Arkansas? Oklahoma? You know, it's got to be very
16 specific because they -- depending on what the state laws
17 require they're recommended --
18 Q. You're saying it's your opinion or belief that the
19 state employees or agents of the state in both states
20 actually pull the soil samples from the fields and not the
21 grower himself?
22     MR. McDANIEL: Object to the form.
23 A. I don't know for sure, but, you know, I'm thinking
24 that, you know, depending on whether you're in Oklahoma or
25 Arkansas, I'm not sure they allow the growers to pull

### Page 104

1 their own samples.
2 Q. But you know for sure they don't in the Eucha
3 Spavinaw Watershed? It's done for them, I believe you're
4 saying. Right?
5 A. That's correct.
6 Q. Prior to this City of Tulsa case settlement were
7 there any differences that you know of between litter
8 management practices, between the two watersheds?
9 A. No.
10 Q. This is before the City of Tulsa lawsuit, which you
11 compared the practices in those two watersheds with regard
12 to how the litter was managed for me?
13     MR. McDANIEL: Object to the form.
14 A. I don't think there would be any difference. Might
15 have been some difference between Arkansas and Oklahoma
16 but not based on their watershed, no.
17 Q. Let me hand you Exhibit No. 11. This is another
18 memo from Ron Mullikin and it does have on this one, I
19 believe you agree, his title. It says, "Director of
20 Personnel/Environmental Affairs/Corporate Training. Do
21 you see that?
22     (Wherein, Plaintiff's Exhibit 11 was marked.)
23 A. Yes, I do.
24 Q. So do you, based upon this, believe that he was --
25 one of his job duties at least was environmental affairs?

### Page 105

1 A. Yes. Based on the way he's showing his title, I
2 would have to agree with that.
3 Q. Okay. This memo is dated November 24th, some three
4 or four months after the second one. This is the third
5 one. The first one was in March, and then July, and now
6 in November, all of 1998. Do you agree?
7 A. Yes.
8 Q. This one goes -- did go to Vic Evans and Dan
9 Henderson, Gene Wilmoth, and Janet Wilkerson. You've told
10 me who those people are. Those are fairly high level
11 executives within the Peterson company. Correct?
12 A. Yes.
13 Q. And this says, the very first sentence, "Time
14 continues to pass with no new solutions for dealing with
15 excess animal waste and environmental problems it is
16 creating."
17     Do you know when these memos were going to these
18 higher executives in the Peterson company what kind of
19 response Mr. Mullikin was getting from any of them?
20 A. No, I don't.
21 Q. Do you agree with Mr. Mullikin's statement in the
22 very first sentence of this memo to the president and
23 other high officers of the company that there is excess
24 animal waste and it is creating environmental problems?
25     MR. McDANIEL: Object to the form.

27 (Pages 102 to 105)