IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MARK FOCHTMAN; CORBY SHUMATE;
MICHAEL SPEARS; ANDREW DANIEL;
FABIAN AGUILAR; and SLOAN SIMMS
Individually, and on Behalf of All Others
Similarly Situated                                                                    PLAINTIFFS

V.                           CASE NO. 5:18-CV-5047

DARP, INC.; HENDREN PLASTICS, INC.;
and JOHN DOES 1-29                                                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Now pending before the Court are a Motion to Dismiss (Doc. 13), a Brief in Support (Doc. 14), and a Reply in Support (Doc. 25) filed by Defendant DARP, Inc. ("DARP"), as well as a Motion to Dismiss (Doc. 15) and a Brief in Support (Doc. 16) filed by separate Defendant Hendren Plastics, Inc. ("Hendren"). Also before the Court are Plaintiffs' Oppositions to the Motions to Dismiss (Doc. 17, 18). For the reasons explained herein, Defendants' Motions are **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

This case is a putative class action, originally filed in Benton County, Arkansas Circuit Court on October 23, 2017, and removed to this Court on November 6, 2017, as Case Number 5:17-CV-05228, *Mark Fochtman and Shane O'Neal v. CAAIR, Inc., Simmons Foods, Inc, DARP, Inc., and Hendren Plastics, Inc.* ("*Fochtman I*"). This Court found jurisdiction is proper under the Class Action Fairness Act, and denied Defendants' motions to remand on February 27, 2018 (Doc. 2). The instant case was severed from *Fochtman I* on February 27, 2018. *See* Case Number 5:17-CV-05228, Doc. 97.

Plaintiffs filed the instant Complaint on March 9, 2018, and alleged violations of the



Minimum Wage Act of the State of Arkansas ("AMWA") (Counts I and II), the Slavery Clause of the Arkansas Constitution (Count III), and the Arkansas Human Trafficking Act of 2013 (Count IV). (Doc. 1). The claims arise from Plaintiffs' drug-court ordered participation in DARP's substance abuse recovery program, where DARP required Plaintiffs to work in Defendant Hendren's plastics plant.

DARP filed a Motion to Dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 13), and Hendren filed a Motion to Dismiss pursuant to Rules 12(b)(6) and (7) (Doc. 15). Regarding the alleged AMWA violations in Counts I and II, both Defendants DARP and Hendren argue that Plaintiffs fail to state a claim because no employee-employer relationship existed. Defendants assert that Plaintiffs did not expect to receive compensation for their labor because they were criminal defendants who voluntarily and knowingly chose to participate in DARP where work was an essential program component. In the alternative, Hendren argues that it did not violate the AMWA because it paid DARP directly for the hours Plaintiffs worked, including overtime.

Regarding the allegations of slavery/involuntary servitude and human trafficking in Counts III and IV, first, both Defendants DARP and Hendren argue that Plaintiffs fail to state valid claims because they entered DARP voluntarily, and they were free to leave the program at any time. Second, Defendants also similarly argue that if Plaintiffs received any alleged threats of incarceration while living at DARP and working for Hendren, such were permissible reminders about the possible future consequences of quitting the program. Third, both Defendants argue that Plaintiffs have not alleged sufficient facts to show that DARP or its agents made statements that constitute coercion,

duress, or menace and rise to the level of slavery/involuntary servitude. Fourth, both Defendants argue that Plaintiffs participated in DARP as part of the punishment for a crime they had committed, and the Arkansas Constitution's Slavery Clause expressly exempts criminal punishment from its proscription on slavery/involuntary servitude.

Hendren offers three additional arguments regarding the slavery/involuntary servitude and human trafficking allegations. First, Hendren argues that the Arkansas Constitution does not provide for a private cause of action to remedy a violation of the Slavery Clause. Next, Hendren argues that the Complaint should be dismissed because the States of Arkansas and Oklahoma are indispensable parties under Rule 19, and sovereign immunity prevents their joinder. Finally, Hendren argues that the slavery/involuntary servitude and human trafficking claims should be dismissed because they are impermissible collateral attacks on sentences.

## II. LEGAL STANDARD

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all of a complaint's factual allegations as true, and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

However, the complaint "must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. In other words, while "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id*.

### III. DISCUSSION

#### A. Counts I and II: AMWA Violations

The critical issue in the first two Counts of Plaintiffs' Complaint is whether Plaintiffs state a plausible claim that they were Defendants' employees. To determine if an employment relationship exists under Arkansas law, courts initially turn to the text of the AMWA, which uses language identical to that of the Fair Labor Standards Act ("FLSA") to define an "employee," "an employer," and "to employ." *Compare* Ark. Code Ann. § 11-4-203 *with* 29 U.S.C. § 203 (both defining "employee" as "any individual employed by an employer"; "employer" as anyone "acting directly or indirectly in the interest of an employer in relation to an employee"; and "to employ" as "to suffer or to permit to work"). Arkansas Administrative Code 010.14.1-112 provides that the Arkansas Department of Labor may rely upon federal precedent established by the FLSA in interpreting the AMWA, and courts regularly use federal FLSA precedent to interpret the AMWA. *See*

*Karlson v. Action Process Serv. & Private Investigation, LLC*, 860 F.3d 1089, 1092 n.3 (8th Cir. 2017); *Harris v. Express Courier Int'l*, 2017 WL 5606751, at *4 (W.D. Ark. Nov. 21, 2017).

The Supreme Court has instructed courts to broadly interpret the meaning of "employee" under the FLSA. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *see also* Ark. Code Ann. § 11-4-204 (stating that the AMWA should be "liberally construed in favor of its purpose"). Furthermore, under the FLSA, the test for employment is one of "economic reality." *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015) (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). Under the economic reality test, courts look at the total circumstances of the economic relationship between the parties, including such factors as the "alleged employers' right to control the nature and quality of their work, the employers' right to hire, or fire, or the source of compensation for their work." *Id.* at 961. These factors are typically used when distinguishing between employee and independent contractor status. *Cf., e.g., Karlson*, 860 F.3d at 1091–92.

At issue in the instant case is not the typical employee/independent contractor distinction, but rather whether an individual should be classified as an employee when he is a resident of a rehabilitative organization for which he provides labor. In *Tony and Susan Alamo Foundation v. Secretary of Labor*, an Arkansas nonprofit religious organization staffed its varied commercial enterprises with "associates" who were largely "drug addicts, derelicts, or criminals," prior to their affiliation with the Foundation. 471 U.S. 290, 292. The associates received no monetary compensation, but were provided

5

in-kind remuneration that included "food, clothing, shelter, and other benefits." *Id.* The Foundation claimed that the FLSA did not apply to their businesses which "minister[ed] to the needs of the associates" and provided "rehabilitation." *Id.* at 297. At trial the associates "vigorously protested the payment of wages, asserting that they considered themselves volunteers," but the Court nonetheless found that they were employees under the FLSA, and that the law's minimum wage and overtime requirements applied "even to those who would decline its protections." *Id.* at 293, 302, 306.

In reaching this conclusion, the *Alamo* Court observed that the associates had been "entirely dependent upon the Foundation for long periods," *id.* at 301, and had both received and expected in-kind benefits which "were simply wages in another form." *Id.* at 293. Thus, under the economic reality test, the associates "work[ed] in contemplation of compensation," and were employees. *Id.* at 306. The Court noted that there are situations where the FLSA did not apply, such as with students and trainees, who "might work for their own advantage on the premises of another" and where there was "no immediate advantage from any work done by the trainees." *Id.* at 301 (citing *Wailing v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947)) (quotations omitted).

In support of their assertion that Plaintiffs are not employees, Defendants point to two similar cases, one of which was recently vacated by the Second Circuit. *See Vaughn v. Phoenix House Programs of New York*, 2016 WL 4223748 (S.D.N.Y. Aug. 9, 2016), *rev'd*, 2018 WL 416485 (2d Cir. Jan. 16, 2018); *Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996). In *Williams v. Strickland*, the Ninth Circuit found that a participant in the Salvation Army's six-month rehabilitation program that included work-therapy was not an

employee under the FLSA because he had "neither express nor implied agreement for compensation," and he had signed an express waiver of employment status. 87 F.3d at 1067. However, key to the Ninth Circuit's analysis was that Williams turned over his public assistance payments and food stamps to the Salvation Army to offset the costs of the benefits he received. The court reasoned that this "strongly counsels against a holding that Williams received the in-kind benefits in exchange for his work" and distinguishes it from *Alamo* "where there was *both* a rehabilitative element and an implied agreement for compensation" due to the Foundation's provision of in-kind benefits. *See id.* at 1067–68.

Turning to the facts alleged in the instant Complaint, the Court concludes that Plaintiffs have sufficiently alleged that the economic reality of their relationships to Defendants was one in which Plaintiffs expected at least in-kind compensation for their work and, thus, could be classified as employees under the AMWA. Like the associates in *Alamo*, here, Plaintiffs claim they were provided with food, shelter, and other benefits and, thus, plausibly worked for Defendants in contemplation of compensation. Defendants' request to dismiss the wage and hour causes of action under the AMWA in Counts I and II will, therefore, be denied.

### B. Count III: Slavery/Involuntary Servitude

Arkansas courts have given scant guidance regarding the interpretation of the Arkansas Constitution's Slavery Clause. *See* Ark. Const. art. 2 § 27. Therefore, it is unknown whether the Arkansas Constitution's Slavery Clause contains an implied private right of action, and, if such exists, whether remedies include monetary damages or are

limited to equitable relief.

Furthermore, the United States Supreme Court has interpreted a similar prohibition on slavery and involuntary servitude in the Thirteenth Amendment of the U.S. Constitution. *Compare* Ark. Const. art. 2 § 27 ("There shall be no slavery in this State, nor involuntary servitude, except as a punishment for crime.") *with* U.S. Const. amend. XIII ("Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States . . .") Federal courts are not in agreement about whether a private right of action for damages exists under the Thirteenth Amendment, although most considering the question have found none. *See John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 997 (S.D. Ind. 2007) (collecting cases finding no implied right of action under the Thirteenth Amendment); *see also Manliguez v. Joseph*, 226 F. Supp. 2d 377, 383–84 (E.D.N.Y. 2002) (finding private right of action under the Thirteenth Amendment's criminal enforcement statute).

Assuming an implied right of action exists, this analysis will focus on involuntary servitude because it has a broader meaning than slavery. *See The Slaughter-House Cases*, 83 U.S. 36, 69 (1872) (observing "the word 'servitude' is intended to prohibit all forms of involuntary slavery of whatever class or name"). The U.S. Supreme Court has defined involuntary servitude as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009) (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988) (quotations omitted)). Thus, to state a claim for involuntary servitude, Plaintiffs

must state facts from which it can be plausibly inferred that Defendants intentionally held Plaintiffs against their will and coerced them to work by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. *See id.* (stating similar elements of a claim for peonage derived from the Thirteenth Amendment).

Critical to a claim of involuntary servitude is an absence of choice. *United States v. Kozminski*, 487 U.S. 931, 953, 108 (1988) ("[C]ompulsion . . . is a necessary incident of a condition of involuntary servitude."). The Thirteenth Amendment does not prohibit "labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are exceedingly bad." *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 486 (2d Cir. 2015) (quotations omitted). The Second Circuit provides examples of such choices with exceedingly bad consequences such as a state requiring an attorney to work pro bono when she could instead choose not to practice law, or a scholarship requiring a doctor to provide pro bono services when he could instead choose to pay damages for a breach of contract. *Id.* at 459 (citing decisions from the Third and Ninth Circuits, internal citations omitted). Moreover, the Fifth Circuit found no involuntary servitude, but rather a "painful choice" when prisoners were offered the option of working outside the jail in a work-release program or remaining in jail. *Graves v. Watson*, 909 F.2d 1549, 1552 (5th Cir. 1990) (noting "[w]hen the employee has a choice, even though it is a painful one, there is no involuntary servitude").

In evaluating the facts in Count III of the Complaint, Plaintiffs have not sufficiently alleged a plausible claim of involuntary servitude or slavery.

First, the Complaint implies that Defendants had the power to have Plaintiffs

9

incarcerated immediately if they left DARP, and this is implausible. For example, Plaintiffs claim:

- "[T]hose who are unable to work are actually jailed." (Doc. 1 at ¶ 1).
- "If a resident leaves DARP . . . they are typically sent to prison." *Id.* at ¶ 25.
- "[T]hey are kicked out of the program and sent to jail." *Id.* at ¶ 28.

Plaintiffs explain that they were at DARP "through court-ordered programs . . . as a condition of probation and in lieu of serving prison time." (Doc. 1 at ¶ 25). However, Arkansas drug court programs "may be either pre-adjudication or post-adjudication," according to the needs and resources of the judicial district. *See* Ark. Code Ann. § 16-98-303 (a)(3)(A). A pre-adjudication drug court orders those who have not yet been found guilty of a crime to participate in drug treatment as a diversionary method; whereas a post-adjudication drug court orders offenders found guilty of crimes to participate in drug treatment as part of their criminal sentences.

It is unclear from the pleadings whether all Plaintiffs are pre-adjudicated or post-adjudicated. The Court notes that in Plaintiff Fochtman's Transfer Order to the Washington County Drug Court, Washington County Circuit Judge Mark Lindsay stated that the program was "pre-adjudication." (Doc. 15, Exh. 4-1).[1] Thus, the alleged threats of imprisonment that Fochtman may have experienced at DARP and/or Hendren seem highly attenuated because, before he or any other Plaintiff could plausibly face imprisonment after leaving DARP, he first would have to appear before a drug court judge,

---

[1] The Court may take judicial notice of state court orders. *See Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 798 (8th Cir. 2009) ("[D]istrict courts have broad discretion to take judicial notice of administrative facts.").

exit the drug court program, potentially undergo adjudication and, finally, if found guilty, receive a custodial sentence. Whereas it is possible that he may be temporarily detained during the process, only after required judicial proceedings could a Plaintiff be "sent to prison."

Nonetheless, at least some drug courts in Arkansas and all drug courts in Oklahoma are post-adjudication courts. See § 16-98-303 (a)(3)(A); Okla. Stat. Ann. 22 § 471.2 (5), (7). However, even assuming all Plaintiffs come to DARP after having been adjudicated guilty of crimes, the imposition of criminal punishment does not qualify as slavery or involuntary servitude under the Arkansas Constitution. See Ark. Const. art. 2 § 27 ("except as a punishment for crime").

Second, regardless of whether Plaintiffs were court-ordered to DARP from pre- or post-adjudication programs, due process requires the state to provide notice and a hearing about any allegations prompting involuntary discharge from a drug-court program *before* taking further action. *Neal v. State*, 2016 Ark. 287 at *9 (Ark. 2016) (holding that "the right to minimum due process before a defendant can be expelled from a drug-court program is so fundamental that it cannot be waived by the defendant in advance of the allegations prompting the removal from the program"); *Hagar v. State*, 990 P.2d 894, 899 (Okla. 1999) ("[T]o meet the requirements of due process, the written notice must set forth the reasons for termination with such clarity that the defense is able to determine what reason is being submitted as grounds for revocation/termination, enabling preparation of a defense to the allegation"); Okla. Stat. Ann. 22 § 471.7 ("Any revocation from the drug court program shall require notice to the offender . . . and a revocation hearing.").

Additionally, participants' procedural due process rights allow them to appeal the decision resulting from a discharge hearing. See Hagar, 990 P.2d at 898 ("[A] defendant has the right to appeal to this Court from a decision to revoke or terminate participation in a Drug Court program."). Thus, even if a post-adjudication drug court ordered a Plaintiff to DARP, the decision to leave DARP without completing the program would not necessitate a direct path to prison, but rather would trigger notice of a hearing as to the possible termination from the program.

Finally, even if Plaintiffs faced the choice between working for Defendants or going to prison, such a painful choice, like that faced by the Graves prisoners who were made to decide between prison or a work-release program, is not considered involuntary servitude under the law. See Graves v. Watson, 909 F.2d 1549, 1552 (5th Cir. 1990). For all of these reasons, Count III for slavery/involuntary servitude will be dismissed without prejudice.

### C. Count IV: Human Trafficking

The Arkansas Human Trafficking Act of 2013 ("AHTA") prohibits trafficking in persons if someone knowingly:

(1) recruits, harbors, transports, obtains, entices, solicits, isolates, provides, or maintains a person knowing that the person will be subjected to involuntary servitude;

(2) benefits financially or benefits by receiving anything of value from participation in [such] a venture . . . .

(3) subjects a person to involuntary servitude; or

12

(4) recruits, entices, solicits, isolates, harbors, transports, provides, maintains, or obtains a minor for commercial sexual activity.

Ark. Code Ann. § 5-18-103. Under the AHTA, "involuntary servitude" is defined as "compulsion of a person to engage in labor, services, or commercial sexual activity" by means that include a "scheme, plan, or pattern of behavior with a purpose to cause a person to believe that if he or she does not engage in labor, services . . . [that] he or she or another person will suffer serious physical injury or physical restraint"; "abuse or threatened abuse of the legal process"; or "the taking of another person's personal property or real property." Ark. Code Ann. § 5-18-102.

The Court has evaluated the facts in the Complaint and concludes that Plaintiffs have not sufficiently alleged a plausible claim of human trafficking under the AHTA. First, Plaintiffs have made no allegations of threats of physical injury or restraint, nor have they alleged the taking of any tangible personal or real property. Second, the alleged threats of coercion and compulsion again seem so highly attenuated as to be implausible, as discussed in Section III.B., *supra*. For all of these reasons, Count IV is dismissed without prejudice.

### D. Motion to Dismiss for Failure to Join Indispensable Parties

To determine whether a party is required or indispensable, courts conduct a context-sensitive inquiry under Rule 19. *See Two Shields v. Wilkinson*, 790 F.3d 791, 798 (8th Cir. 2015) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)). Courts begin the inquiry of whether to dismiss under Rule 12(b)(7) by ascertaining if the party is "required" under Rule 19(a)(1). A party is required to be

joined if "in that person's absence, the court cannot accord complete relief among existing parties," or if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1).

First, in analyzing whether complete relief can be afforded the parties, courts are mindful this "does not mean that every type of relief sought must be available, only that meaningful relief be available." *Henne v. Wright*, 904 F.2d 1208, 1212 n.4 (8th Cir. 1990). The mere fact that litigation may affect a non-party's interest does not mean that the non-party is required, but rather the court looks to whether its actions can resolve the dispute between the existing parties. *See LLC Corp. v. Pension Ben. Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983).

Second, in analyzing whether a third-party's interest would be impaired, courts only look at whether the impairment results from their absence from the litigation, not from the consequences of the litigation. *Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th 1984); *see also Two Shields*, 790 F.3d at 797 (finding that, absent joinder, the United States' interests were impaired when plaintiffs were required to prove the United States breached its fiduciary duty). When a party is not found to be a required party under Rule 19(a), courts do not need to analyze further. *Rochester Methodist Hosp.*, 728 F.2d at 1016.

In evaluating Hendren's argument that the States of Arkansas and Oklahoma are required and indispensable parties, the Court finds that the issue in the case can be resolved by the current parties, and meaningful relief against Defendants is available,

including injunctive, declaratory, and monetary relief, without the states' participation. Second, Arkansas and Oklahoma will not be prejudiced by their non-participation in the litigation. Unlike in *Two Shields*, where an element of a claim required a showing that the United States breached its fiduciary duties, nowhere in the instant case does an element of a claim require a showing that a state drug court's referral to DARP was improper. Finally, Hendren's argument that Arkansas and Oklahoma "have a vested interest *in the outcome* of this case" (Doc. 16 at 32) (emphasis added) due to the possible effects that this Court's rulings could have on the drug courts' referral options is insufficient to justify joinder. *See Two Shields*, 790 F.3d at 797 (holding that joinder analysis does not depend on whether the eventual consequences of the litigation will somehow affect a non-party).

## IV. CONCLUSION

For the reasons explained herein, **IT IS ORDERED** that Defendants DARP and Hendren's Motions to Dismiss (Docs. 13, 15) are **GRANTED IN PART AND DENIED IN PART** as follows: (1) Defendants' Motions to Dismiss Counts I (Failure to Pay Minimum Wage) and II (Failure to Pay Overtime) are **DENIED**; and (2) Defendants Motions to Dismiss Counts III (Slavery/Involuntary Servitude) and IV (Arkansas Human Trafficking Act) are **GRANTED**, and Counts III and IV are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED** on this 27th day of June, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE