UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ARTHUR COPELAND, individually and on )
behalf of all others similarly situated; )
BRANDON SPURGIN, individually and on )
behalf of all others similarly situated; and )
BRAD McGAHEY, individually and on )
behalf of all others similarly situated, *et al.*, )
                                  )
       **Plaintiff,**        )
                                    )
    **v.**                )   **Case No. 17-CV-564-TCK-JFJ**
                                    )
**C.A.A.I.R., INC.;** )
**SIMMONS FOODS, INC.;** )
**SIMMONS PET FOOD, INC.;** )
**JANET WILKERSON;** )
**DON WILKERSON;** )
**LOUISE DUNHAM;** )
**JIM LOVELL; and** )
**DOES 1-10, inclusive,** )
                                    )
      **Defendants.**     )
                                    )

## OPINON AND ORDER

Before the Court are (1) Simmons Foods, Inc.'s and Simmons Pet Food, Inc.'s (collectively, "Simmons") Motion to Dismiss (Doc. 49) and (2) Simmons's Motion to Strike Fraud Allegations (Doc. 67). For the reasons discussed below, Simmons's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**. Simmons's Motion to Strike is **DENIED**.

## I.    Factual Background[1]

Defendant Christian Alcoholics & Addicts in Recovery, Inc. ("C.A.A.I.R.") is a long-term residential drug and alcohol recovery program headquartered in Jay, Oklahoma. (Doc. 42, pg. 8, 11.) It was founded by Defendant Janet Wilkerson ("Wilkerson"), current C.E.O., Defendant Don

---

[1] These facts are as alleged in Plaintiffs' Second Amended Complaint.

Wilkerson, current Vice President of Operations, Defendant Louise Dunham, an HR specialist and current Vice President of Finance, and Rodney Dunham.  (Doc. 42, pg. 9, 21.)

Plaintiffs are residents of C.A.A.I.R.  Like many residents, the three Plaintiffs for whom Plaintiffs have provided specific factual allegations, Plaintiffs Arthur Copeland, Brandon Spurgin, and Brad McGahey, entered the C.A.A.I.R. program through Oklahoma's drug court.  (Doc. 42, pg. 4-7, 12.)  All three thought that the program was a drug and alcohol program offered through the drug court, and agreed to enter the C.A.A.I.R. program for at least a year as a condition of probation and in lieu of serving prison time.  (Doc. 42, pg. 4-7.)  Once there, however, they were provided no rehabilitation services, but were required to work in excess of 40 hours a week for Simmons.  This work was done under "constant threat of incarceration"—staff of both C.A.A.I.R. and Simmons routinely threatened to send Plaintiffs to prison if their work was deemed unsatisfactory, or if they were unable to work due to injuries.  (Doc. 42, pg. 4-7, 13).  Plaintiffs also allege that if Plaintiff McGahey got hurt or worked too slowly, "his bosses threatened him with prison."  (Doc. 42, pg. 6.)  Plaintiffs were not paid for their work at Simmons.  (Doc. 42, pg. 4-7.)  However, C.A.A.I.R. did provide them with "daily bologna sandwiches and a bunk-bed in a cramped, unsanitary dorm room."  (Doc. 42, pg. 3.)

While residents of C.A.A.I.R., Plaintiffs were not provided with appropriate safety or medical care.  For example, Plaintiff Spurgin was injured when a metal door crashed down on his head, causing spine damage and chronic pain.  (Doc. 42, pg. 5.)  Similarly, Plaintiff McGahey's hand got stuck in a conveyor belt, causing "severe crush injury."  When this happened, "[o]ne of C.A.A.I.R.'s top managers" picked Plaintiff McGahey up at Simmons's plant and took him to the hospital.  After returning to C.A.A.I.R., however, Plaintiff McGahey was required to work, in contravention of his doctor's orders.  C.A.A.I.R. representatives also told him that if he did not work at Simmons, he would be required to work on the C.A.A.I.R. campus, but that the time would

not count towards his one-year sentence.  (Doc. 42, pg. 6-7.)  Plaintiffs also allege that other named Plaintiffs were "ordered to work while injured" and suffered "numerous, serious injuries, including head, knee, and back injuries, acid burns, and other injuries for which they were not provided appropriate medical care."  (Doc. 42, pg. 8, 13.)

Further, while C.A.A.I.R. holds itself out as a long-term residential drug and alcohol recovery program, it is not certified as a treatment provider and provides no meaningful treatment for its residents, including rehabilitative and psychiatric treatment.  (Doc. 42, pg. 2, 8, 11 and 12.) Plaintiff Copeland was not provided with any drug and rehabilitation services, which caused him to relapse in his drug addiction.  (Doc. 42, pg. 4-5.)  In addition to failing to provide rehabilitation services, C.A.A.I.R. would not allow those in its program to take prescribed psychotropic medicines.  One resident who was denied his medication became emotionally unstable and was dismissed from the program—and C.A.A.I.R.'s rural property—at night, during a rainstorm.  (Doc. 42, pg. 8.)  C.A.A.I.R. also "pressured" one Plaintiff to return to work two days after his two-month-old son died, but before the viewing and funeral had taken place.  (Doc. 42, pg. 8.)

Finally, Defendants Janet Wilkerson, Ron Wilkerson, and Louise Dunham, and Rodney Dunham, founded C.A.A.I.R. with the purpose of providing income to C.A.A.I.R. and themselves, and cheap labor to third-party agricultural interests affiliated with C.A.A.I.R.  (Doc. 42, pg. 21.) C.A.A.I.R.'s founders had no background in drug and alcohol treatment, but one or both of Defendants Janet and Ron Wilkerson, as well as Rodney Dunham, were former executives at Peterson Farms, a chicken processing company later acquired by Simmons in 2008.  (Doc. 42, pg. 12.)  To secure residents for C.A.A.I.R. and workers for Simmons, C.A.A.I.R. often sent Vice President of Program Management Jim Lovell and other employees on recruiting trips to jails across Oklahoma.  (Doc. 42, pg. 8-9.)  Further, C.A.A.I.R. admits to filing for workers compensation on behalf of its injured residents, including Plaintiff Spurgin, and keeping the

resulting payments.  (Doc. 42, pg. 5, 13.)  Finally, Plaintiffs allege that Wilkerson, in her capacity as C.E.O., is responsible for devising and implementing C.A.A.I.R. policy, a fundamental and essential component of which is involuntary servitude, and conspired with C.A.A.I.R. and Simmons for the provision of involuntary labor.  (Doc. 42, pg. 13-14, 22.)  Wilkerson and C.A.A.I.R. also transported labor across state lines.  (Doc. 42, pg. 13.)

As an affiliated agricultural interest, Simmons contracted with C.A.A.I.R. to purchase Plaintiffs' labor in exchange for donations and/or payment for the labor at a discounted rate.  (Doc. 42, pg. 12.)  At the time of Plaintiffs' residence at C.A.A.I.R., all Defendants were joint and co-employers of Plaintiffs and all C.A.A.I.R. residents, as all Defendants directed, controlled, and supervised the work performed by these workers.  For example, Plaintiff Copeland was initially assigned to the "live hang line" where he was expected to hang 60-62 chickens per minute, and was eventually promoted to the position of sharpening the knives and scissors of other workers who slaughtered chickens.  (Doc. 42, pg. 4.)  Plaintiff Spurgin was assigned to work at the chicken processing plant at night.  (Doc. 42, pg. 5.)  Finally, Plaintiff McGahey was first assigned to work in evisceration, suctioning guts and blood out of slaughtered chickens, and then later was assigned to work as a grader, arranging raw breasts, thighs, and legs into orderly piles.  (Doc. 42, pg. 6.)  However, Simmons told Plaintiffs that they were "contract labor" and that it was C.A.A.I.R.'s responsibility to provide treatment for their work-related injuries.  (Doc. 42, pg. 8, 13.)  Finally, Plaintiffs allege that Simmons conspired with Wilkerson by executing explicit agreements and contracts for the provision of involuntary labor, among other things.  (Doc. 42, pg. 13-14.)

Plaintiffs filed their Second Amended Complaint ("SAC") on December 6, 2017, bringing federal and state wage claims, Racketeer Influenced and Corrupt Organizations ("RICO") Act claims, a Missouri common law claim, an Oklahoma state human trafficking claim, and several claims under the Trafficking Victims Protection Act ("TVPRA").  (Doc. 42.)  On January 15,

2018, Defendants C.A.A.I.R., Jim Lovell, Don Wilkerson, and Janet Wilkerson filed an answer (Doc. 48) and Simmons filed a Motion to Dismiss (Doc. 49).

## II.    Rule 12(b)(6) standard

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

The Tenth Circuit has interpreted "plausibility" to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008).  Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotations omitted).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*  "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.  In considering a motion to dismiss under Rule 12(b)(6), the Court generally may not consider facts outside of those alleged in the complaint.

### III.    FLSA and State Wage Claims (Claims 1, 2, 6, 7, 8, 9, and 11)

#### A.    Background and Underlying Policies

Plaintiffs have brought several claims for failure to pay minimum wage and overtime pay, pursuant to both the Fair Labor Standards Act ("FLSA") and various state laws.   Simmons contends that Plaintiffs were not its employees during their time at C.A.A.I.R., under either the FLSA or relevant state laws.   However, as the Parties agree that the relevant state laws use the FLSA's definition of "employee," the Court need only determine if Plaintiffs are employees under the FLSA.   (Doc. 49, pg. 32; Doc. 54, pg. 19.)

Under the FLSA, employees of covered employers are afforded minimum wage and overtime protections.   *See* 29 U.S.C. §§ 206(a); 207(a).   The FLSA defines an "employee" as "any individual employed by an employer."   *Id.* at § 203(e)(1).   It also defines "employ" as "to suffer or permit to work."   *Id* at § 203(g).   Consistent with the breadth of these definitions, Courts look to the economic realities of an individual's working relationship with the employer, rather than labels or structure to determine whether the individual is an employee under the FLSA.   *See Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1159-60 (10th Cir. 2018).   Additionally, despite any contract or agreement between the parties, an employee may not waive their employee status.   *Id.*

#### B.    The *Bonnette* factors weigh in favor of finding Plaintiffs to be employees

Rather than alleging that Plaintiffs failed to state a claim that they were not paid minimum wage or overtime pay, Simmons argues that Plaintiffs were not employees under the FLSA.   To determine whether a person meets the definition of "employee" under the FLSA, the Tenth Circuit has applied an "economic realities" test.   *Acosta*, 905 F.3d at 1159-60.   However, the test outlined in *Acosta* is one designed to distinguish an employee from an independent contractor, and is not directly applicable to the instant case.   In cases where a plaintiff is in the rehabilitative custody of an institution and in cases where a plaintiff has alleged joint employment—both the case here—

6

courts have looked to factors set out in *Bonnette v. Cal. Health & Welfare Agency*. These factors are whether the alleged employer: (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records. 704 F.2d 1465, 1470 (9th Cir. 1983); *see, e.g.*, *Fuentes v. Compadres, Inc.*, No. 17-cv-01180-CMA-MEH; 2017 U.S. Dist. LEXIS 204128, *34-36 (D. Colo. Dec. 12, 2017) (using the *Bonnette* factors to evaluate whether employers are joint employers); *Zevallos v. Stamatakis*, No. 17-cv-253-DN, 2017 U.S. Dist. LEXIS 201961, *10 (D. Utah Dec. 6, 2017) (same); *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1179 (N.D. Okla. Nov. 29, 2006) (same); *Hale v. Arizona*, 967 F.2d 1356, 1362 (9th Cir. 1992) (using *Bonnette* factors to determine if an inmate was an employee); *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320 (9th Cir. 1991) (same); *Watson v. Graves*, 909 F.2d 1549, 1552-53 (5th Cir. 1990) (same); *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984) (same). Accordingly, in this case, the Court looks to the *Bonnette* factors to determine whether Simmons has sufficient control over Plaintiffs for Plaintiffs to be employees and to serve the policy goals of the FLSA. However, these four factors are not exhaustive, and the Court must consider the totality of the circumstances when weighing these and any other relevant factors. *See Zachary*, 471 F. Supp. 2d at 1179, citing *Bonnette*, 704 F.2d at 1470.

In this case, the *Bonnette* factors weigh in favor of finding that the Plaintiffs are employees of Simmons. Though Plaintiffs have failed to allege any facts regarding the fourth *Bonnette* factor—maintenance of employment records—all remaining factors support the Court finding that Plaintiffs were employees of Simmons for the purposes of FLSA coverage. For example, Plaintiffs' allegations that Simmons threatened them with prison if their work was unsatisfactory, or if they were unable to work, suggest that Simmons had the power to hire and fire Plaintiffs. Simmons also exercised control over Plaintiffs' work schedules and conditions of employment by

maintaining the Simmons facility in which Plaintiffs worked, and moving Plaintiffs between different positions in the facility, each with specific requirements.

Finally, Simmons "determin[es] the rate and method of payment." While Plaintiffs allege that C.A.A.I.R. set their rate of pay—which was zero—Plaintiffs also allege that Simmons made donations to C.A.A.I.R. in return for free labor and/or paid C.A.A.I.R. a discounted rate for the work performed. This indicates that Simmons understood itself to be receiving labor for less than the required minimum wage and overtime pay. Based on the requirement that the Court consider the economic realities of a relationship, the third factor is also satisfied.

Finally, Simmons's statements to Plaintiffs, as alleged in the SAC, do not contradict this analysis. Though Plaintiffs have alleged some facts indicating that Simmons considered Plaintiffs contract labor—such as describing Plaintiffs as contract labor, paying for Plaintiffs' work directly to C.A.A.I.R., and failing to provide Plaintiffs with medical care—these facts are not sufficient to undermine the weight of Plaintiffs' allegations. In light of the four *Bonnette* factors, the economic realities of the situation, and the policies behind the FLSA, the Court finds that Plaintiffs have pled a claim that they were employees of Simmons for the purposes of FLSA coverage.

### C.     The Policies Underlying the FLSA support finding Plaintiffs to be employees

When enacting the FLSA, Congress outlined several policies underlying the law. Congress sought to prevent the spread and continuation of labor conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and to prevent "unfair method[s] of competition in commerce" stemming from such labor conditions. See 29 U.S.C. § 202(a). The allegations in this case present an example of both such situations. For example, while Plaintiffs have not alleged that being paid would have allowed them to improve their conditions while in the custody of C.A.A.I.R., requiring Simmons to pay minimum wage or overtime pay may still further the policy of ensuring health, efficiency, and

8

general well-being of workers.  Though Plaintiffs have alleged that C.A.A.I.R. provided for their basic needs, such as food and lodging, allowing Plaintiffs to retain and save their wages would likely further Plaintiffs' health, efficiency, and well-being once they are released from C.A.A.I.R.'s custody.  Moreover, these allegations fall squarely within the unfair methods of competition that the FLSA was enacted to prevent, as Simmons's access to this source of labor at below-market costs would have artificially reduced its costs.  Requiring that Plaintiffs be paid minimum wage and overtime pay would prevent Simmons from developing an unfair advantage over its competitors, and would therefore prevent unfair competition.  *See Vanskike v. Peters*, 974 F.2d 806, 811 (7th Cir. 1992); *Hale v. Arizona*, 967 F.2d 1356, 1363 (9th Cir. 1992).  Accordingly, the instant case falls well within the policy aims of the FLSA.

### D. Plaintiffs' rehabilitative relationship with C.A.A.I.R. is not prohibitive

Simmons argues that Plaintiffs are not employees under FLSA because they performed work for Simmons without promise or expectation of compensation, but solely for personal purposes.  While it is true that the FLSA does not reach workers who carry out activities without the promise or expectation of compensation, but only for their own personal pleasure or profit, alleged employers cannot use this principle to shield all otherwise-covered work in which workers obtain more than just a financial benefit.  *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295-301 (1985).  In *Alamo*, the Supreme Court held that despite the workers' own insistence that they were merely volunteering for the institution that rehabilitated them, the fact that the workers were completely dependent on the Foundation for long periods meant that the workers must have expected to receive in-kind benefits in exchange for their services.  *Id.*  The Court accordingly held that exempting these employees from the FLSA would exert downward pressure on wages in competing businesses, undermining the FLSA's goal of preventing labor conditions detrimental to worker well-being.  *Id.*

9

Similarly, in this case, though Plaintiffs started working for Simmons through their association with a rehabilitation facility that cared for their basic needs, they have alleged they worked in excess of full time for Simmons, and that Simmons purchased their labor either at a discounted rate or with a donation to C.A.A.I.R. These allegations plausibly allege that construing Plaintiffs as volunteers and exempting them from the FLSA would artificially lower Simmons's costs and undermine the FLSA's goal of preventing unfair competition. Further, though Simmons has correctly pointed out factual distinctions between this case and *Alamo*, these distinctions are not relevant to the question of whether exempting Plaintiffs from the FLSA would undermine one of its goals. Such distinctions are more appropriately considered on the more developed factual record of summary judgment. Accordingly, this argument does not justify dismissal pursuant to Rule 12(b)(6).

This case is also distinct from the two cases upon which Simmons relies, *Vaughn v. Phoenix House Programs* and *Williams v. Strickland*. *See Williams v. Strickland*, 87 F.3d 1064 (9th Cir. 1996); *Vaughn v. Phoenix House Programs*, No. 14-CV-3918 RA, 2015 U.S. Dist. LEXIS 129275 (S.D. N.Y. Sept. 25, 2015). In *Vaughn*, the plaintiff agreed to participate in an in-patient drug treatment program in lieu of a prison sentence. During his time in in-patient treatment, he was required to work for Phoenix House, the treatment provider. However, the work that he performed was directly and exclusively related to the operation of Phoenix House. Accordingly, unlike Plaintiffs in the instant case, his labor neither competed with other employees who would have been entitled to minimum wage nor allowed an employer access to a pool of workers to whom it were not required to pay minimum wage.

Similarly, in *Strickland*, Williams applied to a Salvation Army Rehabilitation Center, apparently without the intervention of the courts. He was required to apply for general assistance and food stamps and turn those benefits over to the Salvation Army to offset the cost of his room

and board.  He was also required—as "work therapy"—to work on projects that benefitted the thrift stores also run by the Salvation Army.  While it is not clear if Williams displaced other workers, on summary judgment, the Ninth Circuit held that Williams's work did not reflect his status as an employee but was one of many ways that he was required to offset the costs of his treatment.

By contrast, in the instant case, Plaintiffs allege that they were required to work for Simmons, a party not involved in their treatment.  Moreover, they allege that Simmons obtained their labor by making donations to C.A.A.I.R. and/or paying C.A.A.I.R. a discounted rate for their labor, giving Simmons an unfair competitive advantage when it sold its products on the open market and without restrictions.  In light of these factual distinctions, *Strickland* cannot support granting a Rule 12(b)(6) motion.

Contrary to Simmons's dire predictions, this reading of *Alamo* and its progeny does not create a *per se* rule that "labor plus long-term room and board equals employment" or undermine any other FLSA holdings.  (Doc. 62, pg. 16.)  The Court has simply found that the SAC has stated a plausible claim analogous to *Alamo* under the Rule 12(b)(6) standard.  Because this Court is not adopting a *per se* rule, there is no danger that this reading will "impose [employment] relationships on unsuspecting parties."  (Doc. 62, pg. 19.)  The obligation of the Court remains to analyze the arrangement between workers and their alleged employer, and determine whether the arrangement violated the FLSA.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).  As part of this obligation, the Court must determine whether the workers are employees to whom the FLSA applies.  In so doing, the Court may look to the policy reasons underlying the FLSA.  *See Alamo*; 471 U.S. at 305; *Hale v. Arizona*, 967 F.2d 1356 (9th Cir. 1992); *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992); *Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990).

Simmons's argument that Plaintiffs, like prisoners, cannot be employees because they have not freely contracted with an employer to sell their labor, is similarly unavailing. While Plaintiffs, who are in the rehabilitative custody of C.A.A.I.R., bear some similarities to incarcerated prisoners, they are not actually incarcerated. Courts do not treat residents of rehabilitative facilities as prisoners for the purposes of FLSA. *See Alamo*, 471 U.S. 290; *Strickland*, 87 F.3d 106; *Vaughn*, 2015 U.S. Dist. LEXIS 129275 (using prisoners as an analogy to demonstrate that considering residents as employees would not have served the purposes of FLSA).

Finally, Simmons's argument that to be employees, Plaintiffs must have freely contracted to sell their labor, is unpersuasive. While Plaintiffs have not alleged that they themselves freely contracted with Simmons, they have plausibly alleged that C.A.A.I.R. freely contracted with Simmons to sell Plaintiffs' labor as a substitute for other employees who would be entitled to minimum wage and overtime pay under the FLSA. Accordingly, Simmons cannot evade the requirements of the FLSA by engaging in a bargained-for exchange with C.A.A.I.R. instead of the Plaintiffs themselves.

## IV.   Unjust Enrichment under Missouri Common Law (Claim 10)

Plaintiffs argue that they have stated a claim for unjust enrichment against Simmons by alleging they were forced to forfeit money for the benefit of Simmons, and Simmons knowingly and willingly obtained monetary benefits to which it was not entitled, unjustly enriching themselves. Simmons argues that Plaintiffs cannot state a claim for unjust enrichment because Plaintiffs had no reasonable expectation of compensation for their labor, and because Simmons has already paid C.A.A.I.R. for their labor. To state a claim for unjust enrichment, Plaintiffs must allege that (1) they conferred a benefit on Simmons; (2) Simmons appreciated the benefit; and (3) Simmons accepted and retained the benefit under inequitable and/or unjust circumstances. *See Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 199 (Mo. 2014).

12

In this case, Plaintiffs have stated a claim for unjust enrichment.  Plaintiffs conferred a benefit on Simmons when they provided Simmons with labor that was necessary for Simmons to run its business, even though Simmons purchased their labor from C.A.A.I.R. at a discounted rate. Plaintiffs have also alleged that Simmons accepted and retained the benefit under inequitable and/or unjust circumstances—as Plaintiffs have alleged sufficient facts to satisfy the *Bonnette* factors, as described in III, *supra*, they have alleged that Simmons knew or should have known that it was acquiring its labor at below-market prices.

Simmons contends that Plaintiffs have not stated a claim for unjust enrichment because they have not alleged that Simmons failed to pay C.A.A.I.R. the amount due for Plaintiffs' labor under their contract.  This argument, however, is unavailing—while a plaintiff in Plaintiffs' situation must generally allege failure of Simmons to pay C.A.A.I.R. the amount due under the contract, this rule is intended to prevent a party in Simmons's position from paying for the same goods or services twice.  *See Lee Deering Elec. Co. v. Pernikoff Constr. Co.*, 247 S.W.3d 577, 582-83 (Mo. App. E.D. 2008), *citing Green Quarries, Inc. v. Ernie Raasch*, 676 (Mo. App. W.D. 1984).  In this case, however, an unjust enrichment claim against Simmons does not pose this same danger.  Plaintiffs have alleged that Simmons did not pay C.A.A.I.R. the amount required by FLSA, and, in conjunction with their other factual allegations, this states a claim for unjust enrichment as to the difference between what Simmons actually paid for Plaintiffs' labor and what it was required by the FLSA to pay.  Simmons may not avoid liability by pointing to a contract that attempts to circumvent FLSA requirements.

Finally, that an unjust enrichment claim only lies when "one who rendered services did so under circumstances warranting a proper inference that he expected the recipient of the services to pay for them, and that the latter, in accepting benefit of the services, was or should have been aware that they were being performed with such expectation" does not counsel a different result.

*See Southwestern Bell Tel. Co. v. United Video Cablevision, Inc.*, 737 S.W.2d 474, 475-476 (Mo. Ct. App. 1987). Simmons did expect to pay for Plaintiffs' labor, demonstrated by the fact that it actually did pay C.A.A.I.R. for the labor. Moreover, as Plaintiffs have alleged sufficient facts to satisfy the *Bonnette* factors, as described in III, *supra*, they have also alleged that Plaintiffs performed labor under circumstances warranting an inference that they expected Simmons to pay for their labor and that Simmons should have known that it was required to pay for Plaintiffs' labor in compliance with the FLSA. Accordingly, Plaintiffs have stated a claim for unjust enrichment against Simmons under Missouri common law.

## V.     Involuntary Servitude in violation of TVPRA (Claim 13)

Plaintiffs allege that Simmons violated the proscription against involuntary servitude contained in 18 U.S.C. § 1584, part of the TVPRA, by using threats and coercion to cause Plaintiffs to reasonably believe that they had no alternative but to continue to work for Simmons. Section 1584 defines a violation as "knowingly and willfully hold[ing] to involuntary servitude or sell[ing] into any condition of involuntary servitude, any other person for any term . . ."[2] Simmons argues that because Plaintiffs were free to leave C.A.A.I.R. at any time, this claim fails as a matter of law.

The TVPRA also defines "involuntary servitude" as "a condition of servitude induced by any means of (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or (B) the abuse or threatened abuse of the legal process." 22 U.S.C. § 7102(8). Abuse or threatened abuse of law or legal process is defined as the use or threatened use of the law or legal process "in any manner or for any purpose for which the law

---

[2] Though the TVPRA is a criminal statute, 18 U.S.C. § 1595 provides a private right of action under the statute.

was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 22 U.S.C. § 7102(1).

Because Congress borrowed the phrase "involuntary servitude" from the Thirteenth Amendment, Courts have construed § 1584 "in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment." *United States v. Kozminski*, 487 U.S. 931, 945 (1988); *United States v. Kaufman*, 546 F.3d 1242, 1260-62 (10th Cir. 2008). "Involuntary servitude" was intended "to cover those forms of compulsory labor akin to African slavery," and is limited to cases involving compulsion of services by the use or threatened use of physical or legal coercion. *Kozminski*, 487 U.S. at 942-48. Modern application of § 1584 has been limited to labor camps, isolated religious sects, or forced confinement. *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 540 (3d Cir. 2012). However, a victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude. *Kozminski*, 487 U.S. at 948. For example, the threat of deportation to an immigrant can constitute a threat of legal concern that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude. *Id.*; *Zavala*, 691 F.3d at 540; *Adia v. Grandeur Mgmt.*, No. 18-2991-cv, 2019 U.S. App. LEXIS 22174, *8 (2d Cir. 2019).

Like immigrants' immigration status when threatened with deportation, Plaintiffs' status as participants in the drug court program constitutes a special vulnerability that the Court must consider when evaluating whether the type and degree of Simmons's conduct is sufficient to hold that person to involuntary servitude. Plaintiffs argue that, *inter alia*, the fact that Simmons required them to work "under constant threat of incarceration," including threatening them with prison if their work was deemed unsatisfactory, or if they were unable to work due to injury, constitutes

15

threatened abuse of law or legal process.  The Court agrees.  Though an employer's threat of incarceration may be too implausible to produce involuntary servitude when made to someone who was not a participant in the drug court program, the same threats are quite plausible to Plaintiffs, who executed plea agreements in criminal cases to allow for their participation in the drug court program.  OKLA. STAT. tit. 22 sec. 471.7(B).  Plaintiffs Copeland, Spurgin, and McGahey also all entered the C.A.A.I.R. program in lieu of serving prison time, and could reasonably find these threats sufficiently plausible to hold them to involuntary servitude.

Moreover, Simmons's argument that it was merely warning Plaintiffs of legitimate consequences of their failure to complete their work for Simmons are unavailing at this stage of litigation for two reasons.  First, Plaintiffs have alleged a plausible claim that Simmons's threats of prison were a self-serving misuse of the law.  While revocation of participation in the drug court program and a prison sentence are contemplated by the Oklahoma Drug Court Act, the drug court program itself is meant to provide "an immediate and highly structured judicial intervention process for substance abuse treatment of eligible offenders."  *See* OKLA. STAT. tit. 22 secs. 471.1; 471.7.  The purpose of the Oklahoma Drug Court Act is to provide this intervention, not to allow parties who contract with treatment programs to retain employees.  *See, e.g.*, *United States v. Camlimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (despite a household staffer being in the United States illegally, immigration laws are not meant to help employers retain secret employees by threats of deportation, and were an abuse of the legal process).  Without the benefit of discovery, including on the substance and circumstances of the alleged threats, the Court cannot find the alleged threats mere warnings.

Second, Simmons had no authority to send Plaintiffs to prison.  Once an offender enters a guilty plea and begins the drug court program, the designated drug court judge makes all judicial decisions concerning that case.  OKLA. STAT. tit. 22 sec. 471.7(A).  Further, for an offender to be

16

sent to prison upon removal from a drug court program, a prison sentence must be provided for in the plea agreement upon which the offenders participation in the drug court program was based. OKLA. STAT. tit. 22 sec. 471.7(B).  Finally, even in a case where that prison sentence is included in a plea agreement, any revocation from the drug court program requires notice to the offender and a revocation hearing to determine whether the offender has violated the conditions of the plea agreement. OKLA. STAT. tit. 22 sec. 471.7(E).

As a party who has contracted with a service provider, the Oklahoma Drug Court Act grants Simmons no power at all over parties in Plaintiffs' position.  Accordingly, the only power that Simmons can hold over Plaintiffs are those legally included in Simmons's contract with C.A.A.I.R.  No facts pled in the SAC indicate C.A.A.I.R. either has, or legally could, delegate sufficient power to Simmons to justify threats of prison as pled in the SAC.  Indeed, absent a more developed factual record, the Court cannot find that C.A.A.I.R. may appropriately make such threats—as described above, only a designated drug court judge, upon notice and hearing, may revoke Plaintiffs' participation in the drug court program, and such a revocation will only result in a prison sentence where that prison sentence was included in a Plaintiff's plea agreement.  Accordingly, the Court cannot dismiss the allegations against Simmons as mere warning of potential legal consequences.

## VI.    Forced Labor in violation of TVPRA (Claim 12) and 21 O.S. § 748, 748.2 (Claim 5)

Plaintiffs allege that Defendants subjected Plaintiffs to forced labor pursuant to 18 U.S.C. § 1589, part of the TVPRA, by, "under false pretenses of a 'rehabilitation' program, forcing them to work full time at Simmons Foods's poultry processing plants, without pay, and under constant threat of abuse or legal process, and/or a scheme, plan, or pattern intended to cause Plaintiffs to believe that if they did not perform the labor or services, they would suffer serious harm, including psychological, financial, or reputational harm, or incarceration."  (Doc. 42, pg. 29.)  Because Plaintiffs have not specified which Defendants against whom they have alleged Claim 12, the

Court construes it as against all Defendants.  Simmons argues that it merely warned Plaintiffs of legitimate adverse consequences.

Section 1589(a) prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person, *inter alia*, by means of the abuse or threatened abuse of law or legal process."  In this case, Plaintiffs have stated a claim against Simmons under § 1589.  The language in § 1589 is broader than the language of § 1584.  In fact, Congress enacted § 1589 as part of the Trafficking Victims Protection Act of 2000, the legislative history of which indicates that Congress sought to expand *Kozminski*'s limited definition of coercion under § 1584.  *See Kaufman*, 546 F.3d at 1261.  Here, the Court has already found that Plaintiffs' allegations that they were required to work for Simmons "under constant threat of incarceration" stated a claim for involuntary servitude under § 1584, due to Simmons's threatened abuse of law or legal process.  Accordingly, the Court finds that Plaintiffs have also stated a claim that Simmons obtained their labor by means of threatened abuse of law or legal process under § 1589's more expansive standard.

Defendants appear to concede that their Oklahoma law human trafficking claim succeeds or fails for the same reasons as their § 1589 claims.  (Doc. 49, pg. 21.)  As the Court has found that Plaintiffs stated a claim for relief under § 1589, Plaintiffs have stated a claim under OKLA. STAT. tit. 21 secs. 748 and 748.2 for the same reasons.

## VII.    Involuntary Servitude and Forced Labor in violation of TVPRA (Claim 14)

Plaintiffs allege that Simmons engaged in involuntary servitude and forced labor pursuant to 18 U.S.C. § 1590, part of the TVPRA, by "bringing [Plaintiffs] to the C.A.A.I.R. facility under the false pretenses of a rehabilitation program" for the purposes of involuntary servitude and forced labor.  TVPRA defines a violation of § 1590 as "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for [peonage, slavery, involuntary servitude, or forced labor] . . . "  However, Plaintiffs have not alleged any facts

establishing that Simmons was in any way involved in bringing Plaintiffs to the C.A.A.I.R. facility

to participate in a rehabilitation program.  In cases where a defendant was not involved in initially

recruiting a plaintiff, the defendant will be an appropriate defendant under § 1590 when it has

transported the plaintiff to a separate location, where the plaintiff was under its complete, long-

term control.  *See Lagayan v. Odeh*, 199 F. Supp. 3d 21, 29-30 (D. D.C. Aug. 2, 2016); *Lagasan

v. Al-Ghasel*, 92 F. Supp. 3d 445, 454 (E.D. V.A. Feb. 18, 2015); *Butigan v. Al-Malki*, No.

1:13cv514, 2014 U.S. Dist. LEXIS 197327, *14 (E.D. V.A. Apr. 2, 2016).  However, Plaintiffs

have similarly not alleged any facts establishing that they were under the complete, long-term

control of Simmons.  While Plaintiffs have alleged facts suggesting C.A.A.I.R. transported

Plaintiffs to Simmons's facilities—such as allegations that Wilkerson and C.A.A.I.R. transported

labor across state lines and that a C.A.A.I.R. manager transported Plaintiff McGahey to the

hospital—they have alleged no corresponding facts to suggest that Simmons also transported them

to Simmons's facility.  Moreover, Plaintiffs have alleged that C.A.A.I.R. provided them lodging,

suggesting that they returned to C.A.A.I.R. facilities when they finished their work at Simmons.

Accordingly, Plaintiffs cannot be said to have been under Simmons's complete, long-term control,

and have not stated a claim against Simmons pursuant to § 1590.

## VIII.   RICO claims (Claims 3 and 4)

Plaintiffs have alleged violations of the RICO Act, 18 U.S.C. § 1961 *et seq.* against

Wilkerson, C.A.A.I.R., and Simmons.  Plaintiffs allege a violation of § 1962(c) against Wilkerson

(Claim 3) and violations of §1962(d) against C.A.A.I.R. and Simmons (Claim 4).   Section §

1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged

in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering

activity . . ."  To state a claim under § 1962(c), a civil RICO defendant must allege that Defendants

(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Tal v. Hogan*, 453 F.3d 1244, 1269-70 (10th Cir. 2006).  "Racketeering activity" is defined, in pertinent part, as any "act which is indictable" under federal law and specifically includes violations of the TVPRA.  18 U.S.C. § 1961(1)(B); *Tal*, 453 F.3d at 1261-62.  These underlying acts are referred to as predicate acts, because they form the basis for liability under RICO.  *Tal*, 452 F.3d at 1261-62 (internal citations omitted).  Section 1962(d) makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  *See Tal*, 453 F.3d at 1270.  Accordingly, to state a claim under § 1962(d), Plaintiffs must first allege an independent violation of subsections (a), (b), or (c).  *Id.*  However, neither Plaintiffs' RICO claims nor the predicate act of those claims must be pled with particularity, as neither sound in fraud.  *See Burnett v. Amrein*, 243 F. App'x 393, 394-95 (10th Cir. 2007).

A.      **Section 1962(c)**

Plaintiffs have alleged a § 1962(c) claim against Wilkerson only.  They argue that the predicate act underlying their § 1962(c) claim is their involuntary servitude claim under 18 U.S.C. § 1584; accordingly, the Court must first determine whether Plaintiffs have stated a § 1584 claim as to Wilkerson.  (Doc. 54, pg. 26.)  For reasons similar to those outlined in V, *supra*, the Court finds that they have.  As with Simmons, Plaintiffs have alleged that C.A.A.I.R. staff routinely threatened them with prison if their work was unsatisfactory or if they were unable to work due to injury.  Plaintiffs also allege that as CEO, Wilkerson was responsible for devising and implementing C.A.A.I.R. policy, of which these threats are a fundamental and essential component.  However, as with Simmons, the Oklahoma Drug Court Act is not intended to provide a population whose labor C.A.A.I.R. can sell at discounted rates for profit.  Further, like Simmons, C.A.A.I.R. does not have the power to send Plaintiffs to prison.  At the most, C.A.A.I.R. has the power to make a motion for the Court to review the offender, the treatment plan, and the provisions

20

of the performance contract. However, the offender will still be entitled to notice and a hearing. *See* OKLA. STAT. tit. 22 secs. 471.7(B). Accordingly, Plaintiffs have stated a claim against Wilkerson under § 1584. Plaintiffs have also alleged that Wilkerson participated in a pattern of racketeering activity, as they have alleged that she was responsible for devising and implementing C.A.A.I.R. policy, which included involuntary servitude such as these threats of prison. *See Salinas v. United States*, 522 U.S. 52, 62 (1997) (a pattern of racketeering activity requires at least two acts of racketeering activity); 18 U.S.C. § 1961(5).

Plaintiffs have also alleged the first two elements of a claim under § 1962(c), Wilkerson's participation in the conduct of an enterprise. An enterprise includes, among other things, any individual, partnership, corporation, association, or other legal entity. 18 U.S.C. § 1961(4). Plaintiffs have alleged that Wilkerson engaged in a pattern of racketeering activity on behalf of an association-in-fact between C.A.A.I.R. and Simmons. To sufficiently allege an association-in-fact enterprise, Plaintiffs must allege that the group has (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. The group must have a common purpose to engage in a course of conduct, but that purpose need not exist beyond or independent of this group's pattern of racketeering activity. *See Crowe v. Clark*, 552 F. App'x 796, 800 (10th Cir. 2014) citing *United States v. Hutchinson*, 573 F.3d 1011, 1020-21 (10th Cir. 2009). In this case, Plaintiffs have alleged that Simmons and C.A.A.I.R. had a contract, and the common purpose of C.A.A.I.R. supplying its agricultural interests, including Simmons, with unpaid labor at below-market costs. While it is unclear exactly how long C.A.A.I.R. and Simmons have been associated, Plaintiffs have further alleged that their arrangement lasted for at least several months, which appears to be enough time for both to pursue the enterprise's purpose—using unpaid labor purchased at below-market costs to increase both parties' profits. Accordingly, Plaintiffs have sufficiently alleged an association-

21

in-fact enterprise. Similarly, because Plaintiffs have alleged that Wilkerson was responsible for devising and implementing C.A.A.I.R.'s policies—including their association with Simmons and threats of prison—they have alleged her participation.

Finally, to state a claim under § 1962(c), Plaintiffs must allege that Wilkerson's conduct was the proximate cause of Plaintiffs' injuries. *See Holmes and Sec. Investors Prot. Corp.*, 503 U.S. 258, 267 (1992). In this case, Plaintiffs have done so. Plaintiffs allege that they were injured because, *inter alia*, they were forced to work without payment and without the ability to leave. This harm is a foreseeable and direct result of C.A.A.I.R.'s policy of issuing threats of prison, which Wilkerson was responsible for devising and implementing. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) (RICO proximate causation looks to whether the alleged violation led directly to the plaintiff's injuries). Accordingly, Plaintiffs have alleged proximate cause, and have stated a claim under § 1962(c) as to Wilkerson.

**B.      Section 1962(d)**

Plaintiffs have also alleged a violation of § 1962(d) against Simmons. The Court reaches this claim because Plaintiffs have alleged an independent violation of § 1962(c). Preliminarily, the Court finds that Plaintiffs have RICO standing. To bring a civil RICO suit, a person must be "injured in his business or property by reason of a violation of § 1962." 18 U.S.C. § 1964. Simmons argues that, because Plaintiffs are not employees of Simmons, lack of compensation for their services does not constitute injury to business or property. However, as the Court has previously held, in III., *supra*, that Plaintiffs are properly considered employees under FLSA, this argument is unavailing at this stage of litigation.

To state a claim for relief under § 1962(d), Plaintiffs must allege that Simmons, by knowing about and agreeing to facilitate a violation of § 1962(c), participated in an enterprise the activities of which affected interstate or foreign commerce. *See United States v. Kamehele*, 748 F.3d 984,

1014 (10th Cir. 2014) (outlining the elements in a criminal case).  Simmons argues that Plaintiffs have alleged no enterprise, that Simmons has not conducted or participated in the enterprise, and that Plaintiffs have not alleged proximate causation.  However, the Court has already found the existence of an enterprise in VIII. A., *supra*.  Further, because Simmons has not argued that Plaintiffs failed to state a claim as to its "knowing about and agreeing to facilitate a violation of § 1962(c)," the Court finds the Plaintiffs have alleged proximate cause for the same reasons they have alleged proximate cause as to Wilkerson, as described in VIII. A., *supra*.

Simmons also argues that Plaintiffs have not alleged that it conducted or participated in the enterprise's affairs, as C.A.A.I.R. itself is the only enterprise, and Simmons merely entered into contracts with C.A.A.I.R. for labor.  This argument is unavailing.  As the Court has held in VIII, A., *supra*, the relevant enterprise for Plaintiffs' § 1962(d) claim is the association-in-fact enterprise between Simmons and C.A.A.I.R.  As a party to the contract between them, paying C.A.A.I.R. a discounted rate for its use of C.A.A.I.R.'s unpaid labor force, Simmons has participated in the enterprise.  Moreover, the instant case is meaningfully distinct from *BancOklahoma Mortg. Corp. v. Capital Title Co.*, the only case which Simmons has cited in support of its contention that a contract alone does not support RICO liability.  *See* 194 F.3d 1089, 1102 (10th Cir. 1999).  In *BankOklahoma*, a title company had not "participated in the conduct" where it "did nothing more than provide their regular services" that it performed in the normal course of business with all mortgage lenders.  *Id.* at 1101-02.  In this case, Simmons's conduct went beyond the normal course of business, as they entered into a contract with C.A.A.I.R. to receive labor at below-market rates, in violation of the FLSA.  It also appears that Simmons executed C.A.A.I.R.'s policy of issuing threats of prison.  Accordingly, Simmons's argument on this element is insufficient, and Plaintiffs have sufficiently alleged Simmons's participation in the enterprise's affairs.

## IX.   Involuntary Servitude and Forced Labor in Violation of the Thirteenth Amendment (Claim 15)

Plaintiffs do not challenge the dismissal of Claim 15.  Accordingly, Claim 15 is dismissed against all Defendants.

## X.   Dismissal is not required under Rule 19

Simmons argues that Plaintiffs Claims 4, 5, 12 and 13, 14 and 15 should be dismissed pursuant to Rule 12(b)(7) for failure to join a necessary and indispensable party, the state of Oklahoma, as required by Rule 19. [3]

A party is a required party who must be joined if

> (A)   in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)   that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i.)   as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii.)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).

Though Simmons has not specified, the substance of its arguments indicate that they are based on Rule 19(a)(1)(B).  However, Simmons has failed to demonstrate that the state of Oklahoma is a required party based on Rule 19(a)(1)(B) because it has not identified an appropriate interest.  For instance, Simmons points to Oklahoma's social interests in sending offenders to work-based rehabilitation, as it reduces overcrowding in prisons, saves the state money, and helps those struggling with addiction secure employment after their term in rehabilitation.  However, the

---

[3] Simmons's Motion to Dismiss makes this argument as to Claims 14 and 15 as well. However, Plaintiffs have voluntarily dismissed Claim 15, and the Court has dismissed Claim 14.

Court cannot determine anything in a finding for Plaintiffs that would prevent the state from sending offenders to work-based rehabilitation programs—or even to C.A.A.I.R., once it remedied any law violations.  It will merely prevent C.A.A.I.R. from violating the law in running its rehabilitation program.  To the extent that Simmons argues that Oklahoma has an interest in sending offenders to C.A.A.I.R. or a similarly-run program, even if its practices are found to violate the law, this is not an appropriate interest, as Oklahoma can have no interest in sending offenders to a rehabilitation facility that is violating the law, even if those law violations make rehabilitation programs more accessible.

Similarly, a holding in favor of Plaintiffs would not collaterally attack the judgment and sentences of the state court.  Before entering the drug court program, offenders must execute a guilty plea agreement.  OKLA. STAT. tit. 22 sec. 471.2(B)(5).  None of the Plaintiffs' plea agreements are under attack in this case, and Simmons has presented no basis for the Court to determine that a finding for Plaintiffs will affect them in any way.  Should the Court find in favor of Plaintiffs, it appears that the state court may, in a manner consistent with the terms of offenders' plea agreements, move offenders to a legally compliant rehabilitation program, or otherwise sentence them.  To the extent that Simmons contends that a finding for Plaintiffs will subject their and other plea agreements to collateral attack in the future, Simmons has presented no argument that allows the Court to evaluate this contention.  Accordingly, the state of Oklahoma has no interest in this case based on the collateral attack of its judgments and sentences.

Simmons has also presented insufficient argument for the Court to determine that a finding for Plaintiffs may subject judges or district attorneys to criminal or civil liability.  Simmons has not presented any argument on what the charges or claims may be, or why the judges and district attorneys may not be entitled to any kind of immunity.  Accordingly, the Court cannot determine

that the state of Oklahoma has an interest in this case based on potential future liability to state judges and district attorneys.

Finally, Simmons argues that the holding in *State v. Tyson Foods*, 258 F.R.D. 472, 476-479 (N.D. Okla. July 22, 2009) suggests that the state of Oklahoma has an interest in this case because it enacted the Oklahoma Drug Court Act and expanded the drug court program.  However, the Oklahoma Drug Court Act is meaningfully distinct from the legislation at issue in *Tyson*.  In *Tyson*, the state brought an action seeking monetary damages and other relief for injury and damage to the Illinois River Watershed.  The Illinois River Watershed is within the lands of the Cherokee Nation, and the Cherokee Nation had enacted a law which allows it to vindicate claimed rights for any pollution of the watershed.  The Court held that this law demonstrated an interest.

However, the Oklahoma Drug Court Act does not demonstrate a similar interest.  The law enacted by the Cherokee Nation directly expressed the Cherokee Nation's interest as a sovereign in vindicating the same rights already at issue in a suit brought by another sovereign.  By contrast, the Oklahoma Drug Court Act establishes the drug court program.  It does not directly express the state of Oklahoma's interest as a sovereign in vindicating the rights at issue in this litigation and the litigation is not brought by another sovereign.  Absent any additional argument that either the Oklahoma Drug Court Act or any other Oklahoma legislation directly expresses an interest in vindicating the rights at issue in this litigation, such as rights under the FLSA, TVPRA, or RICO, Simmons has not identified an interest showing that the State of Oklahoma is a required party.  Accordingly, dismissal is not required under Rule 19.

## XI.     Motion to Strike (Doc. 67)

Simmons has filed a motion to strike Plaintiffs' allegations of fraud, arguing that either Plaintiffs should be required to plead their fraud allegations with particularity pursuant to Rule 9(b) or that the fraud allegations should be stricken pursuant to Rule 12(f), as they are irrelevant

and scandalous.  C.A.A.I.R. joined this motion.  (Doc. 68.)  Plaintiffs argue that Rule 12(f) motions are disfavored and that their allegations of fraud and misrepresentation are necessary to support their claims, which are not claims of fraud.  The motion is timely, as Simmons has filed only a motion to dismiss, rather than an answer, and motions to dismiss are not responsive pleadings.  *See Clifford v. Premier Hous., Inc.*, No. CIVA 06-1111 MLB, 2006 WL 2710338, at *2 (D. Kan. Sept. 20, 2006) (a motion to dismiss was not a responsive pleading for the purposes of Rule 15(a)).

Rule 12(f) permits the Court to strike "any redundant, immaterial, impertinent or scandalous matters" from a pleading.  "Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored." *Oilfield Improvements, Inc. v. Coston*, No. 10-CV-577-TCK-TLW, 2012 U.S. Dist. LEXIS 68104, at *3 (N.D. Okla. May 15, 2012) (internal citations omitted); *see* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1382 (3d. ed. 2012).  Motions to strike "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."  Wright & Miller, *supra*, § 1382; *see Parker v. City of Tulsa*, No.16-cv-0134-CVE-TLW, 2016 U.S. Dist. LEXIS 149669, at *3 (N.D. Okla. Oct. 28, 2016).  Prejudice includes the increased time and expense required to conduct discovery or prepare for trial on an irrelevant contention.  *See Parker*, 2016 U.S. Dist. LEXIS 149669, at *3.  Finally, regardless of whether the moving party has demonstrated that the allegations contained in the pleading violate Rule 12(f), the Court still possesses the discretion to grant or deny the motion.  *See Big Cats of Serenity Springs, Inc. v. Vilsack*, 84 F. Supp. 3d 1179, 1198 (D. Colo. 2015); *see also* Wright & Miller, *supra*, § 1382 (the district court possesses considerable discretion in disposing a Rule 12(f) motion); *SFF-TIR, LLC v. Stephenson*, 250 F. Supp. 3d 856, 978 (N.D. Okla. 2017).

In this case, the Court finds that Simmons's motion to strike should be denied, as Simmons and C.A.A.I.R. have failed to demonstrate that the challenged allegations have no possible relation or logical connection to the subject matter of the controversy or that they may cause some significant prejudice to one or more of the parties in the action.  The allegations to which Simmons and C.A.A.I.R. object are apparently very limited words and clauses in the SAC that suggest that Defendants engaged in fraud and misrepresentation.   (Doc. 67-1.)   Though Simmons and C.A.A.I.R. argue that these allegations carry serious and stigmatizing allegations of fraud that will damage their reputation as long as the lawsuit remains pending, the extremely limited nature of these allegations vitiates that argument.  Moreover, the allegations have a "possible relation or logical connection to the subject matter of the controversy" as Plaintiffs argue they are relevant to at least their claims under the FLSA, and they appear relevant to refuting Simmons's argument under *Strickland* that Plaintiffs did not have the subjective expectation of compensation by Defendants.  Though arguments under *Strickland* were not sufficient, in light of Plaintiffs' other allegations, to justify dismissing Plaintiffs' wage claims pursuant to Rule 12(b)(6), such an argument may be persuasive based on the more developed factual record of summary judgment.

Finally, Simmons's argument that Rule 9(b) requires that, if the challenged allegations are not stricken, Plaintiffs should be required to plead them with particularity, is moot.  As demonstrated by the fact that every case that Simmons has cited in support of this contention addresses a motion to dismiss, this argument is most appropriately raised in a Rule 12(b)(6) motion.  (Doc. 74, pg. 4, n.8.)  Indeed, Simmons and Plaintiffs have already briefed this issue in their Reply and Surreply to Simmons's Motion to Dismiss.  (Docs. 62 and 63.)  Simmons argued that Plaintiffs' TVPRA claims hinge on a theory of widespread, systematic fraud, which Plaintiffs failed to plead with particularity (Doc. 62), while Plaintiffs argued that their TVPRA claims required no showing of fraud (Doc. 63.)  However, the Court need not resolve this issue, as

Simmons itself concedes that the appropriate remedy for Plaintiffs' failing to plead allegations of fraud with particularity would be to disregard the allegations of fraud in evaluating a Rule 12(b)(6) motion.  (Doc. 62, pg. 12.)  In this case, the Court has not relied on any of the extremely limited contentions which Simmons seeks to strike in holding that some of Plaintiffs' TVPRA claims state a claim upon which relief can be granted.  Accordingly, for the reasons described *supra*, the Court exercises its discretion to deny Simmons's motion to strike.

## XII.   Conclusion

For the reasons set forth above, the Court finds that Simmons Foods's and Simmons Pet Foods's Motion to Dismiss (Doc. 49) is **GRANTED** in part and **DENIED** in part.  Simmons's Motion to Strike (Doc. 67) and C.A.A.I.R.'s Joinder in Motion (Doc. 68) are both **DENIED**.  Simmons Foods's and Simmons Pet Foods's Unopposed Motion for Hearing on Defendants' Motion to Dismiss (Doc. 65) is **DENIED AS MOOT**.

Claim 14 is **DISMISSED** as against Simmons Foods and Simmons Pet Foods.

Claim 15 is **DISMISSED** against all Defendants.

**SO ORDERED** this 11th day of September, 2019.

**TERENCE C. KERN**
**United States District Judge**