IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ARTHUR COPELAND, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 17-CV-564-TCK-JFJ |
| | ) |
| C.A.A.I.R., INC., a not-for-profit Corporation, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss the claims of Plaintiffs Brad McGahey, ("McGahey"), Craigory Blue ("Blue"), Dwayne Moss ("Moss") and Arthur Copeland ("Copeland") for Lack of Subject Matter Jurisdiction. (Doc. 131). Plaintiffs filed a Response to said motion (Doc. 141), and Defendants filed a Reply (Doc. 145).

**I. BACKGROUND**

**A. The CAAIR Program**

Christian Alcoholics and Addicts in Recovery ("CAAIR") located east of Jay, Oklahoma, is a residential addiction-recovery program. (Doc. 131, Ex. 1, Wilkerson Decl., at ¶ 2).[1] Its mission is to help men suffering from drug and alcohol addiction to recover and become productive members of society. Id. It realizes this mission through a program of work training, individual and group counseling, NA and AA classes, life skill courses, weekly Bible study and church attendance. Id. CAAIR's rehabilitative model is primarily work-based; in addition to their coursework and counseling sessions, participants in the program perform work at various nearby

---

[1] All referenced documents are attached as exhibits to Defendants' Motion to Dismiss (Doc. 131).

work-providers, including Simmons. Id. at ¶ 3. This work is meant to give participants a sense of self-worth and accomplishment and allow them to develop job skills in a structured, drug-free environment. CAAIR participants are not paid for the work they perform in the program. Id.

Before being admitted to CAAIR, prospective participants undergo an intensive interview process. Id. at ¶ 4. During this time, a CAAIR representative explains the program in detail, including what the interviewee should expect if accepted. Id. Prospective clients are required to read and sign paperwork acknowledging their understanding of the program. Id. In particular, a prospective client must acknowledge and agree, among other things:

- that he will "participate in all programs and activities of CAAIR, Inc. including, but not limited to, … working at a designated job site,"

- that he "is a client of CAAIR"—"not an employee,"

- that he "did not come to CAAIR, Inc. seeking work" and that "CAAIR, Inc. did not offer [him] a job,"

- that he will "not receive wages" or otherwise be paid for the work he performs in the program,

- that failure to maintain his position with an assigned work provider is considered a "major rule violation," warranting "disciplinary action up to and including discharge … from the CAAIR program,"

- that he "may be discharged from CAAIR, Inc. with or without cause … when such discharge would be in the best interest of the Center."

- that he "may voluntarily discharge [himself] from CAAIR," and

- that he is "free to leave at any time" but that he may face "consequences from the criminal justice system for the early departure."

Id.; see also Ex. 1-A, CAAIR Info Packet, at 3, 5, 9.

CAAIR similarly advises all referring authorities, including all sentencing courts, which send clients to the program. Ex. 1 at ¶ 4. Simmons is a work-provider for CAAIR. Id. at ¶ 10. Simmons pays CAAIR for the work performed by CAAIR participants at rates well above

applicable minimum wage. Id.

### B. Brad McGahey

In September 2008, Brad McGahey was charged with one count of knowingly concealing stolen property in Marshall County District Court. (Ex. 2, McGahey State-Ct. R., at 1). He pleaded guilty to the offense and received a five-year deferred sentence. Id. at 3–14. In July 2009, the district attorney moved to accelerate McGahey's deferred sentence based on a variety of probation violations. Id. at 15–16. The court later found that McGahey had violated the terms of his probation and set his case for sentencing. Id. at 17. At sentencing, the court expressed dissatisfaction with McGahey's attitude toward probation, characterizing him as a "scofflaw"—"someone who just scoffs at the law, ignores it, until they absolutely have to obey it," someone who "tries to blow off everything and … to find the easy way out of everything." Id. at 52. The court then gave McGahey a choice: prison or CAAIR. McGahey chose CAAIR:

> THE COURT: …. [W]hat I'm going to do in this case is I'm going to give him a choice. Either go to a treatment center where he would stay and work even [though] he doesn't have a drug and alcohol problem…. I have CAAIR specifically in mind where he would stay a minimum of nine months or I can send him to the penitentiary. But today he'd be remanded to the custody of the county sheriff and I would ask Mrs. Rogers to line up a treatment center and we'd set off sentencing for him to go and do nine months and get up and work every day or he can go to the penitentiary. I'm going to give him that choice if you want to talk to him.
>
> MR. SWARTZ: I think I can make that answer for him, Your Honor. He'll go to the work center, Your Honor.

Id. at 53. The court went on to explain that CAAIR was a work-based program, that it was "a lot of work," and that he would "work six days a week and … go to AA and things like that at night." Id. The court further explained that if McGahey failed to complete the program, the court would "give him five years in the penitentiary." Id. at 54. Finally, the court warned McGahey, "[D]on't try to play fast and loose with [CAAIR's] rules or they'll kick you out and then you'll end up in

the penitentiary if they kick you out." Id. at 56. McGahey indicated he understood. Id. The court entered an order directing McGahey to CAAIR on March 9, 2010. Id. at 58.

McGahey interviewed for admission to the CAAIR program on April 15, 2010. (Ex. 1-B, McGahey CAAIR File, at 1). During that process, McGahey was advised and acknowledged, in writing, that participation in the CAAIR program entailed "[w]orking at a local job provider for 40 hours a week," Id. at 3, and that "[f]ailure to maintain [his] position at [his] assigned work provider" or "to follow the rules and regulations of [his] assigned work provider" were "Major Rule Violations," Id. at 7. He further acknowledged that he was "not an employee of … CAAIR," "did not come to … CAAIR … seeking work," and would "receive no pay" for work performed in the program. Id. at 8, 10. Finally, McGahey acknowledged that he was "free to leave at any time," Id. at 8, 10, and "agree[d] to abide by all rules of [the] CAAIR [program]," Id. at 7.

On June 28, after approximately two months in the program, McGahey left CAAIR and was remanded to the Marshall County jail. Id. at 12–14; (Ex. 2 at 59). On September 21, 2010, the court entered judgment, accelerating McGahey's five-year deferred sentence. (Ex. 2 at 60–62).

**C. Craigory Blue**

In August 2013, Craigory Blue was charged with two felony counts of possession of a controlled substance (one for marijuana, the other methamphetamine) in Marshall County District Court. (Ex. 3, Blue State-Ct. R., at 1). He pleaded guilty to both counts as part of a plea agreement in which he agreed to complete the CAAIR program. Id. at 2, 5, 7. During his change-of-plea hearing, the court went over the terms of his plea agreement, including what he could expect at CAAIR. Id. at 30–32. The court (acting through the same judge who sentenced McGahey) stressed that CAAIR was a work-based program and that if Blue went there, he would be required to "work and work hard." Id. at 31. The court further warned that if Blue failed to complete the program, he

would not "get a good sentence." Id. at 32. The court's colloquy with Blue is set forth below:

> MR. JONES: If I may, Judge. … [Blue is] going to plead, going to go to CAAIR.[1] Basically the same deal, if he completes it, he'll get a suspended sentence.
>
> THE COURT: Okay.
>
> MR. JONES: He's got two counts. He'll plead to both counts.
>
> THE COURT: All right, Mr. Blue. We just heard one of the colleagues next to you.
>
> DEFENDANT BLUE: Yes, sir.
>
> THE COURT: You've got to go to CAAIR.
>
> DEFENDANT BLUE: Yes.
>
> THE COURT: I'll say this to both of you, you don't go to CAAIR and get up [at] ten and watch Oprah or Dr. Phil or whoever else is on, Ellen or whatever T.V. shows are on. You don't that. You don't watch T.V. You may get to watch T.V., but you don't get to sleep in and twiddle your thumbs and sip lattes. You go there and you work and work hard. Have to get up early and work hard. Probably collapse into bed and say thank God I made it through this day and I'll get up and do it again. I'm not trying to scare you, but it's a great program. I've heard great things about it, but it's not going to be easy so you understand that? Both of you do?
>
> DEFENDANT SHIPLEY: Yes, sir.
>
> DEFENDANT BLUE: Just like home.
>
> THE COURT: And so you understand if you do well, you should receive a favorable sentence, probably probation. If you don't complete the program, you won't get a good sentence. You understand that? And you understand it's not a specific one year program. Might be a little more, might be a little less.
>
> DEFENDANT BLUE: Yes, sir. …
>
> THE COURT: …. [B]oth of you gentleman understand that if you leave the program on your own or they remove you because you didn't comply with their rules, you are to report immediately to the Marshall County Jail and if you don't that could cause more severe things that would be detrimental to you. So you understand that, the two gentleman going to CAAIR?
>
> DEFENDANTS SHIPLEY AND BLUE: Yes, sir.

Id. at 30–32, 43–44. The court later entered an order directing Blue to CAAIR. Id. at 47.

Blue interviewed for admission to the CAAIR program on September 24, 2013. (Ex. 1-C, Blue CAAIR File, at 1). During that process, Blue was advised and acknowledged, in writing, that participation in the CAAIR program included "[w]orking at a local job provider for 40 hours a week," Id. at 3, and that "[f]ailure to maintain [his] position at [his] assigned work provider" or "to follow the rules and regulations of [his] assigned work provider" were "Major Rule Violations." Id. at 7. He further acknowledged that he was "not an employee … of CAAIR," "did not come to … CAAIR … seeking work," and would "receive no pay" for work performed in the program. Id. at 8, 10. Finally, Blue acknowledged that he was "free to leave at any time," Id. at 8, 9, and "agree[d] to abide by all rules of [the] CAAIR [program]," Id. at 7.

Blue graduated from the CAAIR program on September 25, 2014. Id. at 15. Consistent with his plea agreement, on September 26, the court entered judgment, sentencing Blue to a six-year suspended sentence. (Ex. 3 at 49).

**D. Dwayne Moss**

In January 2012, Dwayne Moss was charged with one felony count of driving under the influence in Adair County District Court. (Ex. 4, Moss State-Ct. R., at 3). He pleaded no contest and received a five-year suspended sentence. Id. at 26–30. In March 2012, the district attorney moved to revoke Moss's suspended sentence for violating the terms of his probation. Id. at 31–35. The court held a hearing on the motion on June 6, 2012. Id. at 36–37. There, Moss stipulated to the violations and was ordered to complete a six-month inpatient alcohol treatment program. Id. at 36– 38, 57. While the court had not yet selected a program for Moss, it nonetheless warned him that wherever he went, if he failed to complete the program, he would be "going to prison for five (5) years." Id. at 38. The court's colloquy with Moss is set forth below:

> THE COURT: All right. Mr. Moss, I have CF-12-3. In that case you were on a five (5) year suspended for a DUI. The State filed an application to revoke

> that alleging that you had violated the rules and conditions of that five (5) year suspended sentence. You are appearing here today with Mr. Strout, have visited, and you are entering a stipulation that you did, in fact, violate those rules and conditions?
>
> MR. MOSS: Yes.
>
> THE COURT: Is that correct?
>
> MR. MOSS: Yes, ma'am
>
> THE COURT: We are going to pass sentencing on that for a term of one (1) year. A condition of passing that sentencing is you are going to be remanded to the custody of the sheriff's office pending your acceptance to an inpatient alcohol treatment.
>
> MR. MOSS: Yes, ma'am.
>
> THE COURT: Okay. That treatment has to be no less than six (6) months, but you have to complete. So you don't to get walk out on day—the final day of six (6) months. You have to stay there, whether it's nine months or a year, until those folks give you a certificate of completion. ….
>
> MR. MOSS: Yes, ma'am.
>
> THE COURT: So on the last day of six months, you can't call and say, I'm coming home. It won't work; okay?
>
> MR. MOSS: Okay.
>
> THE COURT: If you fail the inpatient, if you get kicked out, if you leave, whatever happens, do you understand you're going to prison for five (5) years?
>
> MR. MOSS: Yes, ma'am, I understand that. ….
>
> THE COURT: Once you complete that treatment, then you would still be on whatever is left of your five (5) suspended. You have all the same rules and conditions.

Id. at 37–39. The court also warned Moss that some inpatient programs have "pretty stringent rules" and that if he violated those rules and was kicked out, he would be "going to prison." Id. at 38–39. When asked if he understood, Moss again responded, "Yes, ma'am." Id. at 39.

On July 18, 2012, the court entered an order releasing Moss to CAAIR pursuant to its prior June 6 order. Id. at 58. Moss interviewed for admission to the CAAIR program the next day. (Ex.

1- D, Moss CAAIR File, at 1). During that process, Moss was advised and acknowledged, in writing, that participation in the CAAIR program involved "[w]orking at a local job provider for 40 hours a week," Id. at 3, and that "[f]ailure to maintain [his] position at [his] assigned work provider" or "to follow the rules and regulations of [his] assigned work provider" were "Major Rule Violations." Id. at 7. He further acknowledged that he was "not an employee … of CAAIR," "did not come to … CAAIR … seeking work," and would "receive no pay" for work performed in the program. Id. at 8, 10. Finally, Moss acknowledged that he was "free to leave at any time," id. at 8, 9, and "agree[d] to abide by all rules of [the] CAAIR [program]," Id. at 7.

Moss graduated from the CAAIR program on April 22, 2013, Id. at 12; (Ex. 4 at 59), and thereafter resumed serving his suspended sentence, (Ex. 4 at 15–25, 39).

**E. Arthur Copeland**

In August 2009, Arthur Copeland was charged with four counts of uttering a forged instrument in Grady County District Court. ( Ex. 5, Copeland State-Ct. R., at 1–2). He pleaded guilty to all four charges and was sentenced to seven years' imprisonment with all but the first five years suspended. Id. at 3–17. In November 2014, while serving his suspended sentence, Copeland was again charged in Grady County District Court with one count of possession of methamphetamine and one count of possession of drug paraphernalia. Id. at 18. As a result, the district attorney moved to revoke Copeland's 2009 suspended sentence. Id. at 20. That revocation motion recounted several other probation violations, including at least three prior instances of methamphetamine use. Id.

In January 2015, Copeland agreed to enter the Grady County Drug Court program as part of a plea agreement in which he pleaded guilty both to the probation violations associated with his 2009 conviction and his newly filed 2014 charges. Id. at 24–29. Under that agreement, if Copeland

successfully completed the program, all charges, including the application to revoke his suspended sentence, would be dismissed. If unsuccessful, the court would revoke his suspended sentence in full and concurrently sentence him to ten years' imprisonment for his 2014 charges. Id. at 27, 29.

During his first year in the drug court program, Copeland repeatedly violated program rules. Id. at 31–32. During that time, he was found to have used methamphetamine on at least ten separate occasions and, as a result, was sanctioned to a total of 32 days in jail. Id. He was also ordered to enter Healthy Lifestyles, an inpatient drug treatment program. He entered that program in July 2015 and successfully completed it one month later. Id. at 33. But that success was short lived. Within weeks of completing the program, Copeland was again found to have used methamphetamine and again was sanctioned with jail time. Id.

By December 2015, the State had had enough and moved to terminate Copeland's participation in the drug court program. Id. at 30, 33. The violation report attached to the district attorney's application summarized the State's reasoning:

> Arthur Joshua Copeland was accepted into the Grady County Drug Court program on 1-26-15 and since that time has made a pattern of violating multiple rules that were designed to aid his recovery. He is in arrears of $715.00 to the District Attorney for supervision fees and of $740.00 to the Grady County Court Clerk. He used methamphetamine on 4-20-15, 4-27-15, 5-24-15, 6-6-15, 6-19-15, 6-21-15, 6-22-15 and 10-29-15. He has been sanctioned to 32 days in jail and completion of an inpatient substance abuse treatment program for these violations of his court ordered rules and conditions. He has not been sanctioned for using methamphetamine on 11-30-15 and 12-9-15. Arthur Joshua Copeland has refused to accept the help that the Grady County Drug Court has offered him and he continues to violate the court ordered rules and conditions that he accepted upon his sentencing to drug court.

Id. at 32, 35.

In January 2016, the court gave Copeland one last chance to avoid incarceration, entering an order directing him to complete the CAAIR program as a "sanction[], Id. at 36, 37," "in lieu of termination," Id. at 39. As part of that order, the court specifically warned Copeland that if he failed to complete the program, "termination proceedings … w[ould] resume." Id.

Copeland interviewed for admission to the CAAIR program on January 7, 2016. (Ex. 1-E, Copeland CAAIR File, at 1). During that process, Copeland was advised and acknowledged, in writing, that participation in the CAAIR program entailed "work training at a job site," Id. at 4, and that "[f]ailure to maintain [his] position at [his] assigned work provider" or "to follow the rules and regulations of [his] assigned work provider" were "Major Rule Violations," Id. at 6. He further acknowledged that he was "not an employee of… CAAIR," "did not come to … CAAIR … seeking work," and would "receive no pay" for work performed in the program. Id. at 4, 7. Finally, Copeland acknowledged that he was "free to leave at any time," Id. at 7, and "agree[d] to abide by all rules of [the] CAAIR [program]," Id. at 6.

During a drug check in August 2016, Copeland tested positive for methamphetamine and admitted to using opiates and alcohol. (Ex. 5 at 42). As a result, the district attorney again applied to terminate Copeland's participation in the drug court program. Id. at 40, 43. Copeland pleaded guilty to the violations alleged in the application and was sentenced according to the terms of his plea agreement to ten years' imprisonment with all but the first five years suspended. Id. at 46–58.

### F. The Copeland Lawsuit

Plaintiffs filed the instant case in October 2017 against CAAIR, Simmons, and several CAAIR officials, alleging that Defendants unlawfully obtained their labor under "threat of incarceration" and that Plaintiffs were "employees" of Defendants and, thus, should have been paid minimum wage and overtime. (Doc.42). Specifically, Plaintiffs assert claims for involuntary servitude, forced labor, human trafficking, RICO, unjust enrichment, and minimum wage and overtime. Id.

### II. STANDARD OF REVIEW

Defendants move to dismiss Plaintiffs' claims for lack of subject-matter jurisdiction. See

*Bear v. Patton*, 451 F.3d 639, 641 n.2 (10th Cir. 2006) (noting that the *Rooker-Feldman* doctrine is a rule of subject-matter jurisdiction). Because "federal courts are courts of limited jurisdiction, [they must] presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013). Where, "as here, a party attacks the factual basis for subject matter jurisdiction, the court may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Fin. SA v. La Plata Cty., Bd. of Cty. Comm'rs*, 126 F.3d 1272, 1275 (10th Cir. 1997). To defeat such a motion, a "plaintiff must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *Southway v. Central Bank of Nigeria*, 328 F.3d 1267, 1274 (10th Cir. 2003). It is Plaintiff's burden to demonstrate that jurisdiction exists. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017). In this case, Plaintiffs have not presented any evidence regarding the Court's jurisdiction and have failed to meet their burden of proof.

**III. ARGUMENT AND AUTHORITIES**

The *Rooker-Feldman* doctrine bars lower "federal courts from reviewing the judgments and decisions of state courts once they have become final." *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1230 n.7 (10th Cir. 2013). The doctrine exists to prevent a party who lost in state court from seeking what, in substance, would be appellate review of a final state decision in federal district court based on the losing party's claim that the state court order itself violates the losing party's federal rights. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017); *Harold v. Univ. of Colorado Hosp.*, 2016 WL 741031, at *5 (D. Colo. Feb. 25, 2016). In short, the doctrine bars lower federal courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments … and inviting district court review and rejection of

those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The *Rooker-Feldman* doctrine is a rule of subject-matter jurisdiction. It derives "from 28 U.S.C. § 1257(a), which allows parties to a state court judgment to seek direct review in the Supreme Court of the United States, but not to appeal to the lower federal courts." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1233 (10th Cir. 2006). The doctrine has four requirements:

1) "the federal plaintiff must have lost in state court,"

(2) "the state-court judgment must have been rendered before the district court proceedings commenced,"

(3) "the federal plaintiff must complain of an injury caused by a state-court judgment," and

( (4) "the plaintiff's suit must invite district-court review and rejection of the state court judgment."

18 James Wm. Moore, Moore's Federal Practice § 133.33[2][a] (3d ed. 2018) (citing *Exxon Mobil Corp*, 544 U.S. at 284). The Court finds Plaintiffs' claims meet each of these requirements.

**A. Plaintiffs lost in state court.**

*Rooker-Feldman*'s first requirement limits the doctrine to federal actions brought by "state court losers." A "state court loser" is someone who (1) was a party to a state court proceeding, see Moore, supra, § 133.33[2][b], and (2) now complains that an order of that state court violates his federal rights, see *Johnson v. Orr*, 551 F.3d 564, 568–69 (7th Cir. 2008); *Hartford Life Ins. Co. v. Solomon*, 910 F. Supp. 2d 1075, 1081 (N.D. Ill. 2012); *Green v. City of New York*, 438 F. Supp. 2d 111, 119 (E.D.N.Y. 2006). Just because a plaintiff acquiesced to an order in state court does not prevent that party from being deemed a "state court loser." See *Hartford Life Ins. Co.*, 910 F. Supp. 2d at 1081; *Niles v. Wilshire Inv. Grp.*, LLC, 859 F. Supp. 2d 308, 336 (E.D.N.Y. 2012). Rather, if the plaintiff complains that an order violates his federal rights, then the order is deemed a "loss" for *Rooker-Feldman* purposes. See *Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249,

273 (E.D.N.Y. 2009); *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 56 F. Supp. 3d 1121, 1140 n.58 (C.D. Cal. 2014).

Plaintiffs' claims meet *Rooker-Feldman's* first requirement. Plaintiffs were each ordered to complete the CAAIR program pursuant to a final state court order. Although Defendants contend CAAIR is a "win" for its participants, Plaintiffs disagree, claiming that the program violated their rights under state and federal law. Given these claims, the orders sending Plaintiffs to CAAIR are deemed a "loss" for *Rooker-Feldman* purposes.

### B. Plaintiffs filed this lawsuit after their state-court proceedings had ended.

*Rooker-Feldman's* second requirement limits the doctrine to cases where the state decision at issue became final before federal proceedings commenced. Under the Supreme Court's decision in *Exxon Mobil*, "a state court judgment is [considered] sufficiently final for operation of the *Rooker Feldman* doctrine … when 'state proceedings have ended.'" *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 24 (1st Cir. 2005) (quoting *Exxon Mobil*, 544 U.S. at 291). This can occur in one of three situations:

(1) "when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved,"

(2) "if the state action has reached a point where neither party seeks further action," or

(3) "if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated."

*Guttman v. Khalsa*, 446 F.3d 1027, 1032 n.2 (10th Cir. 2006) (quoting *Federacion*, 410 F.3d at 24).

Here, Plaintiffs filed this case in October 2017, years after leaving CAAIR and long after their state-court criminal proceedings had ended. At the time, there was no ongoing action in any of their state proceedings, and their opportunity to appeal the orders sending them to CAAIR had long since passed. This satisfies *Rooker-Feldman's* second requirement.

### C. Plaintiffs' alleged injuries are the product of state-court orders.

*Rooker-Feldman's* third requirement limits the doctrine to federal actions complaining of injuries caused by a state-court judgment. See *Mo's Express*, 441 F.3d at 1237. This prohibition extends not only to claims, "actually decided by a state court," but also those "inextricably intertwined with a state court judgment." *Cowan v. Hunter*, 2018 WL 1212541, at *3 (N.D. Okla. Mar. 8, 2018). "A claim is inextricably intertwined if the state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress." *Tal v. Hogan*, 453 F.3d 1244, 1256 (10th Cir. 2006). "In other words, an element of the claim must be that the state court wrongfully entered its judgment." *Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012).

In applying this limitation, courts "look beyond the four corners of the complaint to discern the actual injury claimed by the plaintiff." *Johnson*, 551 F.3d at 568. Plaintiffs cannot avoid the rule through "clever pleading," *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005), or by "casting the complaint in the form of a civil rights action," *Johnson*, 551 F.3d at 568. Nor can a plaintiff manufacture jurisdiction by pinning his injuries on a third party whose conduct was itself "the product of a state court judgment." *McCormick v. Braverman*, 451 F.3d 382, 394 (6th Cir. 2006). In short, "plaintiffs can't transform the test through creative lawyering." *Market v. City of Garden City*, 723 Fed. Appx. 571, 575 (10th Cir. 2017).

On this point, the Tenth Circuit's recent decision in *Market* is instructive. Much like the present case, *Market* involved a former state-court criminal defendant suing for money damages based on the alleged illegality of her sentence. Id. at 571–72. The plaintiff in that case, Jada Market, had twice been convicted and jailed for driving under the influence of alcohol. Id. On both occasions, she was sentenced to the mandatory minimum required by a municipal ordinance. Id.

At the time, she "accepted and served her sentences without challenge." Id. at 572. Years later, however, she filed a federal lawsuit against the municipality, alleging that enforcement of the ordinance's mandatory minimums violated her due process rights. Regarding jurisdiction, *Market* argued that her claims were not barred by *Rooker-Feldman* because she was not asking the court to overturn her convictions but rather was seeking money damages for "unlawful enforcement" of those convictions through "illegally extended incarceration." Id. at 574. The district court disagreed, dismissing her claims for lack of subject matter jurisdiction. And on appeal, the Tenth Circuit affirmed.

In doing so, the Tenth Circuit held that *Rooker-Feldman* bars federal suits challenging state court criminal sentences and that *Market's* requested relief, money damages, impermissibly sought to "undo … her state-court punishment." Id. Along the way, the Court stressed that plaintiffs cannot avoid *Rooker-Feldman* through "creative lawyering." Id. at 575. Although Market's claims were "cleverly framed" to avoid the doctrine, the Court nonetheless looked beyond the form of those claims to their substance. Cf. Id.("The limitation on upsetting a state-court judgment isn't a pleading requirement—it's substantive."). Because Market's injuries were the product of a state court judgment, the Court affirmed the dismissal of her claims on jurisdictional grounds.

Here, Plaintiffs' claimed injuries—being required to work without compensation, under threat of incarceration—are the direct result of the state-court orders sending them to CAAIR. The essential element underlying each of Plaintiffs' claims is that their state sentencing courts should not have ordered them to complete the CAAIR program or face incarceration—that they should have sent them to some other recovery program, one that either doesn't have a work-requirement or pays minimum wage. This is precisely the sort of *de facto* appeal that *Rooker-Feldman* was meant to prohibit.

In the instant case, Plaintiffs attempt to avoid *Rooker-Feldman* by framing their claims as an attack on Defendants' conduct rather than the court's. Specifically, they argue they aren't challenging the state-court orders sending them to CAAIR, only the requirement that they perform work without compensation and under threat of incarceration. The Court finds this is a distinction without a difference. Defendants did not require Plaintiffs to attend CAAIR—an Oklahoma state court did. CAAIR is a work-based recovery program. Participants in the program are required to work without compensation at work-providers, including Simmons. This requirement is one of the "Major Rules" of the program, which participants are advised of and acknowledge, in writing, before ever entering CAAIR. If a participant doesn't want to adhere to the rules, they are free to leave at any time. The fact that Plaintiffs' failure to complete the CAAIR program would have resulted in a lengthy prison term is not an injury traceable to Defendants. Rather, it is the actual and proximate result of Plaintiffs' state court criminal proceedings. See Ex. 2 at 56 ("THE COURT: …. [D]on't try to play fast and loose with [CAAIR's] rules or they'll kick you out and then you'll end up in the penitentiary if they kick you out."); Ex. 3 at 32, 43–44 ("THE COURT: …. If you don't complete the program, you won't get a good sentence …. [I]f you leave the program on your own or they remove you because you didn't comply with their rules, you are to report immediately to the Marshall County Jail."); Ex. 4 at 38 ("THE COURT: If you fail the inpatient, if you get kicked out, if you leave, whatever happens, do you understand you're going to prison for five (5) years? MR. MOSS: Yes, ma'am, I understand that."); Ex. 5 at 39 ("In lieu of termination [Defendant] is to complete the 1 yr CAAIR program…. If [Defendant] fails to complete CAAIR[,] termination proceedings in the Grady County Drug Court will resume.").

**D. Plaintiffs ask this Court to review and reject the state-court orders sending them to CAAIR.**

Finally, *Rooker-Feldman's* fourth requirement limits the doctrine to claims inviting federal

district court review and rejection of a state-court judgment. This requirement focuses on the plaintiff's requested relief, specifically, whether that relief "would reverse or 'undo' [a] state court" decision. *Market*, 723 Fed. App'x at 574 (quoting *Mo's* Express, 441 F.3d at 1237). Once again, creative lawyering "can't transform the test." Id. The fact that a plaintiff does not expressly ask to reverse or undo a state-court judgment—or even denies seeking such relief—is not controlling. See Id.; *Hoblock,* 422 F.3d at 88 ("Can a federal plaintiff avoid *Rooker–Feldman* simply by … alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself? Surely not."). Rather, it is "the substance[,] not the form[,] of the requested relief [that] ultimately control[s]." *Centifanti v. Nix*, 865 F.2d 1422, 1429 n.8 (3d Cir. 1989); accord *Market*, 723 Fed. App'x at 574. Thus, where a plaintiff seeks money damages to remedy or "undo, to the extent possible," the effects of a state-court judgment, the doctrine applies, and the claims are barred. See *Market,* 723 Fed. App'x at 574; *Mo's Express*, 441 F.3d at 1237.

Here, Plaintiffs seek money damages in an effort to put themselves in the same position they would have been in had they never gone to CAAIR. This is precisely the sort of "backward-looking request for personal compensation" that *Rooker-Feldman* prohibits. See *Market*, 723 Fed. App'x at 574 ("*Market* seeks to undo, to the extent possible, her state-court punishment. Though time served can't be returned, compensatory damages attempt to put plaintiffs in the position they would be in without the faulty imprisonment. That isn't allowed." (citation omitted)).

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss (Doc. 131).

**IT IS SO ORDERED this 10th day of December, 2020.**

**TERENCE KERN**
**United States District Judge**